Olmstead *v.* Camp.

SAMUEL E. OLMSTEAD *vs.* SAMUEL R. P. CAMP.

The act of 1864, known as the flowage act, (Rev. of 1866, p. 89,) is not unconstitutional.

The owner of an existing mill sought, by a petition under that act, to raise his dam to a greater height. He had already raised it to substantially the height prayed for, under a license from the respondent that had since been revoked, and was now wrongfully keeping it up. Held, that this fact did not affect the case.

The mill was a grist mill, and with regard to its usefulness to the public it was found, that the petitioner was a grocery merchant in a manufacturing community, where the people relied very much for all supplies upon the grocery stores—that ground feed for pigs, poultry, cows and other domestic animals, were articles necessarily kept in such stores for the accommodation of the community—that the plaintiff erected the mill for the purpose of grinding such feed, and also flour for himself and for others engaged in the same business, and for the community generally—that the wants of the community generally for custom grinding were not such as absolutely to require the erection and maintenance of the mill, and their custom grinding would not furnish it full employment—that its erection and use for custom grinding was a public benefit, and would continue to be such, if all the accommodation required should continue to be extended to the public for that purpose—but that the mill stood on land of the petitioner, and that he was under no legal obligation to permit the public to have access to it, or to grind for them, if he chose to decline to do so. Held, that the mill was of such general usefulness as to constitute a "public use."

The mill was in the possession of a tenant at will, by whom it was run on his own account and for a stated rent. Held, that this was no objection to the bringing of the petition by the owner.

The committee, to whom the petition was referred under the statute, and who assessed the damages to be paid to the respondent for the flowing of his land, refused to hear evidence offered by the respondent to show the value of his land to the mill of the petitioner if flowed as proposed. Held, that the evidence was properly rejected.

The petition prayed for authority to raise the dam to the height of eleven feet and four inches. The committee found that the flowing of the land as prayed for in the petition would be for the public use, and established the dam at the height of ten and a half feet. Held, that there was no inconsistency in this.

PETITION under the act of 1864, known as the flowage act, for the right to flood by a mill pond certain land of the respondent; brought to the superior court for Fairfield county. The petition alleged that the petitioner was the owner of a tract of land, situated in Norwalk, in quantity about twenty-three acres, bounded northerly by the land of the re-

spondent; that upon a portion of the land was a water mill already erected, which was used for the purpose of grinding flour and feed and doing custom work such as is usually done in a country mill, and that water power only was used in the mill; that he had on the premises a mill pond and dam, that the dam ran across New Canaan river, about sixty feet in length, and was, as he had a right to keep and maintain it, about five feet four inches high; that it was of the highest importance to the usefulness of his mill, and would be for the public use, to raise the dam six feet higher and thereby to flow the land of the respondent; and he prayed that he might be permitted to raise his dam to the height aforesaid, and thereby flow the land of the respondent back to the north about nine hundred and ten feet beyond the north line of the petitioner, and in width about six hundred feet east and west; the land to be flowed by the raising of the dam being more particularly described as follows, [describing it;] that he had applied to the respondent to agree with him as to the damages to be paid for the privilege of flowing the land, and that the respondent had wholly refused to agree with him respecting the same; and praying the court to inquire into the allegations aforesaid, and, on finding them true, to appoint a suitable committee of three judicious freeholders of Fairfield county, and to cause the damages in the premises to be appraised, and to cause to be granted to the petitioner the perpetual right to flow said land of the respondent pursuant to the provisions of the statute.

The case was referred to a committee under the provisions of the statute, who made the following report.

"The undersigned, freeholders of the county of Fairfield, having been appointed by the superior court, at its October term, 1864, in said county, by an order of said court, a committee to hear and decide in the matter of the petition of Samuel E. Olmstead against Samuel R. P. Camp, pending before said court, praying for leave to flow the land of the respondent, do respectfully report:—That due notice having been given to said parties of the time and place of such hearing as required in said order or decree, we met the said par-

ties at the time and place in said decree named ; and after hearing said parties, petitioner and respondent, and their witnesses and counsel, and having also ourselves visited the premises in question, we are of opinion, and do find, that the flowing of the land in said petition and said decree described, and as therein proposed, will be for the public use ; and we do find and establish the height to which said dam may be built by the petitioner, and thereby the water raised, to be the height of ten feet and six inches from the bottom of said dam as it now is, which will be one foot higher than the top of the dam as it now is, said dam having already been raised, by the petitioner higher than he has a right to keep and maintain it permanently ; and we do fix and establish the time during which said dam may be kept up hereafter to be the whole time during each year hereafter ; and we do assess the sum to be paid to the respondent by the petitioner for the right to flow said land according to this our report, and also the damage occasioned to other land of the respondent by raising the water at a crossing place, to be four hundred dollars. All which is respectfully submitted. Dated January 24th, 1865.

Joshua B. Ferris, }<br>
Chas. Brown,    }   Committee<br>
Lemuel Sanford, }   under oath."

The respondent filed the following remonstrance against the acceptance of the report :—

1. That upon the hearing of the cause before the committee it appeared that at the time of the bringing of the petition and at the time of the hearing thereon the petitioner had no control over the mill, mill-dam or pond, but that the same were and for a long time previous had been leased to Jonathan Camp, Jr., who was then in the possession of the same, and that the time when the estate of the said Camp in the premises would be determined did not appear from the evidence ; that said Camp had the sole and exclusive possession and control of the mill, and was not by the terms of his lease or in any other manner bound to grind grain at the mill for the public, or by the use of the mill to accommodate the public in any way, but was privileged to use the mill as he

pleased without the intervention of the petitioner or any other person or persons.

2. That at the hearing of the cause the respondent offered evidence to prove the value of his land to the petitioner for the purpose of enabling him to increase the power of his mill by raising his dam and flowing the land; to the admission of which the petitioner objected and the committee rejected it.

3. That it appeared from the evidence offered by the petitioner that such a dam as he asked for the right to erect had been before the bringing of the petition unlawfully erected, and that said dam at the time of said hearing was in existence, and was unlawfully kept and used by the petitioner; and thereupon the respondent objected to all the evidence offered by the petitioner, because the evidence was not offered to show, and did not tend to prove, that it would be for the public use to construct a dam at the place mentioned in the petition, but only to show that it would be for the public use to allow the petitioner to continue a dam before that time unlawfully erected; but the committee received the evidence.

4. That it did not appear from the report that the committee had found that it would be for the public use to flow the land of the respondent as described in their report, and by means of such a dam as they had established.

5. That the act of the legislature under which the petition was brought, and by virtue of which the committee acted, is unconstitutional.

Upon the hearing of this remonstrance the court found the following facts :—

1. It was in evidence before the committee and is true that the petitioner had, prior to the bringing of the petition, leased the mill to Jonathan Camp, Jr., his brother-in-law, for an indefinite period, namely, till Camp should find other business which he preferred, or the petitioner should find a tenant who would pay him a greater rent, or whom he preferred; and that Camp was to pay at the rate of $700 per year therefor. The letting was by parol, and there was no agreement that Camp should do custom grinding for the public, which

obligated him to do it; but such had been the practice from the time when the mill was erected, and it was the expectation of the parties to the lease that the practice would be continued. The mill had two runs of stone, and the custom work was never at any time sufficient to furnish employment for it at an ordinary stage of the water. Camp left the premises and ceased to be a tenant some time last spring, and had since been engaged in other business.

2. The facts as to the second objection were as stated in the remonstrance.

3. In respect to the third objection, it was found that the dam was originally erected to the height of about five and a half feet, flowing only the petitioner's land; that afterwards the petitioner obtained of the respondent's grantor a license by parol to raise it about four feet higher, and flow the grantor's land, for which an annual sum of $6 was paid, and that the petitioner sometimes raised it about one foot higher temporarily by flash-boards; that the respondent after he purchased it countermanded the license, and that the petitioner had no legal right to flow the land at the time the petition was brought to the extent that the dam as it then stood would flow it, and that the evidence was offered and received as in the objection set forth.

4. That the ground of the fourth objection fully appeared upon the record.

5. In respect to the matter of public use, it was found that the petitioner was a member of a firm of grocery merchants in a manufacturing community, where people rely very much for all supplies upon the grocery stores; that ground feed for pigs, poultry, cows, and other domestic animals, were articles necessarily kept in such stores for the accommodation of such a community; that the plaintiff erected the mill for the purpose of grinding such feed, and also flour, for said firm, for others engaged in the same business, and for the community generally; that the wants of the community generally for custom grinding were not such as absolutely to require the erection and maintenance of the mill, and their custom grinding would not furnish it full employment; that its erection

and use for custom grinding was a public benefit, and would continue to be such if all the accommodation required should continue to be extended to the public for that purpose, but that the mill stood on land of the petitioner, and that he was under no legal obligation to permit the public to have access to it, or to grind for them if he chose to decline to do so. It was further found that such other general facts as had been or could be in any case considered proper or sufficient evidence of such incidental public benefit as to constitute the flowing of private property, in order to erect mills and factories, a taking for public use, existed in this case, and were to be considered as if specially set forth.

Upon these facts the court reserved for the advice of this court the questions, whether said objections should be overruled and the report be accepted ; whether the raising of the petitioner's dam and flowing the respondent's land would be " for public use " within the meaning of the act entitled " an act to encourage the erection and support of water power manufactories ; " and the question whether any and what decree should be passed.

*Carter*, for the petitioner.

1. No one but the petitioner, who is the owner of the mill and dam, could bring and maintain such a petition as this. The lessee had no interest that would sustain a petition. Whether as between lessor and lessee the petitioner could immediately enter upon the land and raise the dam, is immaterial to the respondent. The lessee was nothing more than a tenant at will.

2. The petitioner's mill was erected for a public custom mill, and has always been used as such. That the mill is private property, that the owner is under no legal obligation to permit the public to have access to it, or to grind for them, or to continue its use at all, is probably true of every grist mill in the state. It is equally true of every railroad track and of every railroad station in the country, and of the property of every cemetery association.

3. The fact that the dam had already been raised higher

than the petitioner had a right to keep it, is immaterial. If the respondent's objection means anything, it means that the petitioner should first have taken down his dam and then asked permission to put it up again. The height to which he asked to raise his dam and to which the committee have found that he should be permitted to raise it, is one foot more than the temporary dam was before.

4. The finding of the committee as to the public use is in the language of the statute, and is all that the law requires should be found on that subject.

5. In this case the mill is for the public use, and the public use it. This fact is found by the committee and by the court, and on general principles every mill of this character must be and is for the public use. It is used directly by the public, as much so as they use a railroad. The general question whether the act under which these proceedings are had is constitutional or not, as applied to ordinary private manufacturing establishments, does not arise here and need not be discussed. It may be remarked however, that as applied to such purposes, an act of the same character has for a long time existed in fourteen states, and been sustained as constitutional. In no state has such an act been pronounced unconstitutional. See Angell on Watercourses, Chapters 11 and 12, and the cases there cited. All the authorities on the subject are there given.

*O. S. Seymour* and *L. Warner, Jr.*, for the respondent.

*First.* The act of 1864, under which this proceeding is brought, and which assumes to authorize the taking of lands for flowage for private mills, is unconstitutional.

The whole question depends upon the construction of the clause in the constitution " for public use," for we think it will not be seriously claimed that the plaintiff can impose on our land the easement with which he seeks to burden it unless it is " for public use " within the fair meaning of the constitution. It is true the constitution does not in direct words forbid the taking of property from one man and transferring it to another for private use, yet the clause which pro-

vides that the property of no person shall be taken for public use without just compensation, does by necessary implication provide that for any other than public use private property shall not be taken. In 5 Selden, 108, *Buffalo & N. York R. R. Co.* v. *Brainard,* the Court say : " From this clause a prohibition of power to take the property of a citizen for private use is clearly implied." The same is affirmed in 11 Wend., 152, by Savage, Ch. J., in the case of the *Matter of Albany street.* Also in 4 Hill, 146, *Taylor* v. *Porter,* where Bronson, J., says : " The words should be construed as equivalent to a constitutional declaration that private property without the consent of the owner shall be taken only for public use, and then only upon just compensation." The same is affirmed by our own court, in *Bradley* v. *N. York & N. Haven R. R. Co.,* 21 Conn., 305 ; and emphatically by Chancellor Kent, 3 Kent Com., Part 5, sec. 34, who says : " It undoubtedly must rest as a general rule in the wisdom of the legislature to determine when public uses require the assumption of private property ; but if they should take it for a purpose not of a public nature, as if the legislature should take the property of *A* and give it to *B,* or if they should vacate a grant of property or of a franchise under the pretext of some public use or service, such cases would be gross abuses of their discretion and fraudulent attacks upon private rights ; and the law would clearly be unconstitutional and void."

It is true the plaintiff does not seek the defendant's land itself, but only the right to flow it ; but if the plaintiff succeeds, he transfers to himself the dominion over the lands, he takes the beneficial use, and deprives the defendant of such use. The mere fee is worthless separated from the use and control of the land. The constitutional restraint is a mere mockery if it protects the ultimate fee only, and not the beneficial use.

Is then the taking contemplated by these proceedings a taking " for public use " within the fair construction of the statute ?

We contend that no taking of property is for public use unless the property is to be *used by the public.* The property

taken for public use is to be used in the *public service,* to an-swer some public exigency, and must be appropriated for that service. The usual applications of this prerogative are, to common public roads, to canals, to turnpikes, to railroads, to ferries and basins. These are clear cases of public use. The public need these means of communication, transportation, &c., for their use. Every member of the community may use the property taken by traveling upon it and sending goods over it, paying in certain cases a reasonable compensation regulated by law. So lands may be taken for necessary public buildings, such as state houses, public offices, court houses, custom houses, forts, arsenals, ship yards, alms houses and penitentiaries. For these purposes the government generally prefers to go into the market as an ordinary purchaser, but it may act upon its prerogative. In this class of cases the property is taken to be used by the government itself and its officials, in a corporate capacity as a government, not by the public generally. So a right of way for a public aqueduct may be taken by virtue of the prerogative, but not a right of way for water for individual domestic uses. By the statute of 1866 such right of way may be taken by an individual or private corporation to conduct water from a dam' to a mill for *milling or manufacturing* purposes, but not for *agricultural or domestic* purposes.

Although a taking for public use is a taking to be used by the public, the title may be vested in a corporation, or perhaps an individual, provided the property is held for the community's use. So by virtue of eminent domain land may be taken for public greens, squares and parks. It may be objected that these are rather for ornament than for use; and it is certain that the Roman emperors in the plentitude of their power hesitated to bring matters of ornament, however public, within the purview of this power; yet parks seem to be for the public use as much as highways, and may be necessary in some cases for public health.

The language of all the law writers is in conformity with the construction for which we contend.

In *Commonwealth* v. *Alger,* 7 Cush., 85, Shaw, C. J., speaks

of the right of eminent domain as the right of a government
to take and appropriate private property to public use ; the
use is connected with the property in the sense of occupation
and enjoyment.   Washburn says in his 2d Vol. of the Law
of Real Property, page 539, " In respect to the right to take
private property by the exercise of what is called eminent do-
main, it can only be done for public uses, and that upon mak-
ing just compensation.   To that extent it is a power inherent
in the sovereignty of every state, and is based upon the idea
that private interests must yield to public necessity.   But
this power does not imply any right on the part of the state
to take the property of one citizen and give it to another,
whether with or without compensation.   This power can be
exercised by the direct action of the legislature, or by creating
a corporation with authority to take lands where it is for pub-
lic use, like the construction of railroads, canals, and other
public works."   It is remarkable that Washburn, while he
cites all the other American decisions on this subject, takes
no notice whatever of the Massachusetts cases, which are
relied upon by the plaintiff's counsel, and which cases cer-
tainly extend the right far beyond the limits indicated by him.
In the case of *Buffalo & N. York R. R. Co* v. *Brainard,* 5
Selden, 100, it was decided that the act authorizing railroad
companies to take land for their roads was constitutional upon
the ground that the land taken was to be appropriated by the
railroad companies to public purposes.   The court say it is
evident that the legislature designed to make these corpora-
tions common carriers of persons and property, and to require
them to be constantly engaged in such public employment.
See also opinion of Hinman, J., in *Nichols* v. *Bridgeport,* 23
Conn., 205.   Judge Storrs says, speaking of this consti-
tutional provision, in *Clark* v. *Saybrook,* 21 Conn., 325,
" Under this restriction the legislature had no power to es-
tablish highways without providing compensation to those
persons whose property was thereby *appropriated* to the *use of
the public.*"   But in the case under consideration the plaintiff
is under no obligation to devote to the public use the rights
of flowage which he seeks to obtain.   He is not expected to

devote them to any public use. No enquiry respecting the use he is to put them to can be made; he is not even under obligations to use the rights he may acquire at all; he may sell them, or keep them for speculation unused and unsold in the expectation and hope of future advance in value. He pays from his private purse the price of the property taken and he owns it as his private property to him and his heirs and assigns. The public pays nothing because the public has no interest in it.

But there is perhaps an incidental public benefit in allow-ing the plaintiff to acquire the right he seeks. The law in dispute proceeds upon the ground of such benefit, to wit, that a water power is thereby brought into existence of greater value than the land submerged by the flowage, whereby the public wealth is increased, and the incidental public benefit is claimed to make the case a taking for public use, and this without any reference to the use to which the property taken is to be appropriated by the new owner.

But whatever public benefits may incidentally result, the taking is manifestly for private use, in contradistinction from public use. The title vests in an individual for his own use, his heirs and assigns, without any restraint except such as all property is subject to, namely, lawful use. To say that property so taken is taken or held for public use is to pervert the plain meaning of words. The purpose is private gain not public good. The public good is a mere incident, but the constitution requires, to warrant the taking, that the purpose, that is, the primary design, should be the public use. But public good and public use are entirely different things; the public must have interest in the thing taken to warrant legis lative interference ; there must be a public right of control of the thing taken as property in which the state has an interest. Public use means possession, occupation, direct enjoyment by the public. The thing taken is to be used by the public, and is taken that it may be so used. Under the constitutional clause in question real estate taken for public use remains in the pub-lic as long as needed for public use, and reverts to the original owner when no longer needed by the public, as in cases of

highways, railways, and canals. This reverter is not however universal. Redfield on Railways, 126. A public benefit resulting incidentally from the transfer of interest in property from one man or set of men to another is not a legitimate ground for the exercise of the right of eminent domain. It has never been regarded as such. Redfield (on Railways, page 111,) says it is defined to be the right to apply private property to public use in those great public emergencies that can reasonably be met in no other way. Applying property to public use is a very different thing from transferring it from one private citizen to another, leaving the property itself in respect to the use of it wholly subject to private control.

In a case where the taking is in its nature for public use, the legislature is supreme in determining whether in the particular case the power shall be exercised. And it may be that the taking will be lawful, and yet in the particular case it may be very clear that the taking is not a public benefit. The laying out a public highway is lawful, and the land taken for it is for the public use, and yet the highway in the particular instance may not be needed and therefore not of public benefit ; but however useless it may be, if laid out by the legislature or by authority derived from the legislature, courts cannot interfere.

As we have before suggested, public benefit and public use are entirely different things. It may be a public benefit that all the lands of the state should be under cultivation or that all the vacant building lots in our cities should be built upon and occupied by industrious families, but a transfer of title by legislative authority in these instances to such as should so cultivate and occupy in order to produce such public benefit, would be void, because though for public benefit it is not a taking for public use. Such a proceeding might be of public use but would not be for such use. The natural import of the term " public use " is public possession and occupation. The terms " use " and " occupation " go together in our legal forms as substantially synonymous. Now if we substitute for this natural import another, namely, public benefit, or general advantage, there can be no limit to legislative power over

private property. If the legislature may say that a transfer of property from one to another may be deemed for public use because of any amount of public benefit incidentally arising therefrom, then the whole control of the subject is with the legislature, and the constitutional restraint is gone. It is in general easy for a court to decide whether the mode of using property taken in a given case constitutes it a public use or a private use, but courts cannot be called on to decide upon the question whether certain legislation is on the whole of public benefit or the contrary. It is the duty of the court to treat all laws as made for the public good. According to the construction contended for on the other side the restraint imposed by the clause of the constitution under consideration is simply that the property of no person shall be taken unless the taking is on the whole for the public benefit, that is, no man shall flow another man's land unless such flowage shall be of general advantage. The public may have an interest in the particular use which is made of property, as for instance in having it used for manufacturing instead of agricultural purposes, but that does not make the manufacturing use a public use. The legislature have no power to make that a public use which in its nature is a private use.

*Second.* The report should be set aside for the other errors assigned in the remonstrance.

1. The court erred in rejecting the evidence offered by the respondent to show the value of his lands to the petitioner for mill purposes. The word " damages " as used in this statute means the same as " full compensation " in the constitution ; and full compensation could only be made by paying the respondent the full value of his lands for any purpose or use he might make of them.

2. The evidence offered by the petitioner and received by the committee was not admissible, because it did not tend to prove that it would be for the public use " to set up a water mill " on the land of the petitioner " or on the land of another with his consent," and to erect a dam for working the same, " or to raise a dam already erected," but it was offered to prove that the dam of the petitioner, before that time erected,

Olmstead *v.* Camp.

and then unlawfully kept and continued, would be for the public use. The statute being in derogation of common law must be construed strictly, and the petitioner can take nothing under it unless he can bring his case within its letter.

3. The committee have not found that the dam established by them will be for the public use. The water power found by them to be for the public use is one created by erecting a dam 11 feet 4 inches high. The one established by them is to be created by a dam 10 feet 6 inches high. It does not follow that because the former will be for the public use the latter will be also. The public necessities exactly measure the right of the committee in establishing this water power. They must take so much as the public necessities require, and can take no more. This court cannot say that a public necessity requiring a dam 11 feet 4 inches, will be satisfied with a dam 10 feet 6 inches high. *Matter of Albany street,* 11 Wend., 149.

4. The petition cannot be maintained because the petitioner had no control over the mill or water power at the time he brought his petition. He had leased the premises without restriction or condition as to their use, and the lessee is not a party to this action. The proceedings under this statute are based upon the allegation and implied pledge of the petitioner, that the water power to be created will be for the public use, and the petitioner, not being able to control the use of it in this case, cannot sustain the allegations on which the petition is based, and therefore has no better right to bring this suit than any other person.

McCurdy, J. The questions presented in this case are deserving of the most serious consideration, on the one side involving rights of property guaranteed by the fundamental law, and on the other affecting, as long as water runs, the interests of business and the prosperity of the state.

The constitution declares that "the property of no person shall be taken for public use without just compensation." This is indeed a principle of natural law. The decision of the case turns upon the meaning and effect of this provision.

The defendant insists that, in favor of private rights, the construction should be strict, and that the term "public use" means possession, occupation, direct enjoyment, by the public. Or in other words that the property must be literally taken by the public as a body into its direct possession and for its actual use, as in the instances of a state-house, a court-house, a fort, an arsenal, a park, &c.

It seems to us that such a limitation of the intent of this important clause would be entirely different from its accepted interpretation, and would prove as unfortunate as novel. One of the most common meanings of the word "use" as defined by Webster, is "usefulness, utility, advantage, productive of benefit." "Public use" may therefore well mean public usefulness, utility or advantage, or what is productive of general benefit; so that any appropriating of private property by the state under its right of eminent domain for purposes of great advantage to the community, is a taking for public use. Such, it is believed, is the construction which has uniformly been put upon the language by courts, legislatures and legal authorities.

Angell, in his treatise on Water Courses, sec. 457, says: "It is obvious that the government of no state can administer its public affairs in the manner most beneficial to the community at large if it cannot in particular emergencies and for *public utility* exercise at least a qualified power of disposing of, or of impairing in value, the property of an individual citizen. To this power, according to Vattel, men have impliedly yielded, although it has not been expressly reserved." Bynkershoek recognizes the same power whenever "the public necessity or public utility requires." Lib. 2, ch. 15. Grotius, Puffendorf and other eminent writers state the principle in similar language. In *Beekman* v. *Saratoga and Schenectady R. R. Co.*, 3 Paige Ch. Rep., 73, Chancellor Walworth says: "If the *public interest can in any way be promoted* by the taking of private property it must rest in the wisdom of the legislature to determine whether the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right." In another case

he says that it is upon this principle of public benefit that the flowage laws of the several states are justified.

Speaking of such laws allowing land to be flowed for mill purposes, Angell says (Treatise on Water Courses, sec. 487): "It seems however to be abundantly well settled that it is sufficiently for the public good; for the statutory law of which we have given an account has been too long engrafted in the jurisprudence of the states in which it has been enacted, revised and amended through a long course of legislation, and too steadily sustained by judicial sanction, to be now declared not to be within the eminent domain of the government. More especially should this long and uninterrupted public acquiescence be deemed conclusive, when it is considered that the line of demarcation between a use that is public and one that is strictly and entirely private is a line not easy to be drawn." In the case of *Fiske* v. *Framingham Manufacturing Co.*, 12 Pick., 68, the court, referring to the earlier laws of Massachusetts for the encouragement of mills, says: "We think they will be found to rest for their justification partly on the interest which the community at large has in the use and employment of mills, and partly on the nature of the property, which is often so situated that it could not be beneficially used without the aid of this power." In *Boston and Roxbury Mill Dam Corporation* v. *Newman*, 12 Pick., 480, it is said: "The principle is, that the lands of individuals are holden subject to the requisitions of the public exigencies, a reasonable compensation being paid for the damage. It is not taking the property of one man and *giving* it to another. At most it is a forced sale to satisfy the pressing wants of the public. Now this is as it should be. The will or caprice of an individual would often defeat the most useful and extensive enterprizes if it were otherwise."

The language of Chief Justice Bigelow, in *Talbot* v. *Hudson*, 24 Monthly Law Reporter, (August, 1861,) p. 228, is very full and explicit. "If land is taken for a fort, a canal or highway, it would clearly fall within the first class (public use.) If it was transferred from one person to another, or to several persons for their own peculiar benefit and advantage,

it would clearly come within the second class (private use.)
But there are intermediate cases where public and private
interests are blended together, in which it becomes more diffi-
cult to decide within which of the two classes they may be
said to fall. There is no fixed rule or standard by which
such cases can be tried and determined. Each must depend
on its own peculiar circumstances. In a broad and compre-
hensive view, such as has been heretofore taken of the con-
struction of this clause of the declaration of rights, every
thing which tends to enlarge the resources, increase the
industrial energies and promote the productive power of
any considerable number of the inhabitants of a section
of the state, or which leads to the growth of towns and
the creation of new resources for the employment of capi-
tal and labor, evidently contributes to the general welfare
and the prosperity of the whole community." Washburn,
in his work on Easements, page 326, says, as the result of his
examination of the constitutional question : " Whatever
therefore might have been thought of statutes like these in
their application to particular cases if the question were now
raised for the first time, their validity must be assumed to
rest upon premises at once well founded and intelligible."
See also a very elaborate opinion in *Newcomb* v. *Smith*,
1 Chandler's Rep., 71. Also *Chase* v. *Sutton Manufacturing
Co.*, 4 Cush., 152 ; 3 Kent Com., part 3, sec. 34.

A similar view of the meaning of the clause has been taken
by our own court. In the case of *Bradley* v. *N. York and
N. Haven R. R. Co.*, 21 Conn. R., 305, Judge Storrs says :
" It is now established by the uniform current of decisions
that the *public benefit* may be so far promoted by the works
authorized to be made by such corporations as the defendants,
that the property of individuals authorized to be taken by
them by their charter *shall be deemed to be taken for the pub-
lic use.*" In *Nicholson* v. *N. York and N. Haven R. R. Co.*,
22 Conn. R., 86, Judge Hinman remarks : " Suppose the
legislature had incorporated a company with power to erect
a mill to be supported by the toll taken from its customers,
and had authorized the company to cross highways with their

canal or ditch, provided they should restore them to their former condition, the question would be the same as here. If *they take property they must pay for it.*" In *Norwich Gas Light Co.* v. *Norwich City Gas Co.*, 25 Conn. R., 39, the court, (Judge Hinman giving the opinion,) recognise the law that " the streets, subject to the public easement, are *private property;*" and yet sustain " the power of the legislature to grant to the plaintiffs the right to lay down their own pipes for the distribution of gas through the streets for their *own private purposes.*"

It is true that certain of these companies are sometimes said to be of a quasi public character. But the distinction, so far as concerns the taking and using of property, is certainly a very nice one. They buy it, hold, control and convey it as their own; and they accommodate those individuals, (composing portions of the public,) who have occasion to do business with them in their own way and so far only as they are paid for doing it. Their obligation to the public is similar to that of inn keepers and ordinary carriers. There is no absolute necessity that travellers should be taken from New Haven to New York in three hours instead of six. But the convenience is so great and it affects so many persons that the improved mode is considered as a public benefit. In most if not all the cases where companies have been allowed by law to take private property or interests in it for their own use, they have no public character, except as their operations, intended for their own emolument, tend also to accommodate numbers of others. Of this description are private cemeteries, private ways, gas companies, water and water-power companies, wharf companies, canal companies, having the privilege to erect and run mills and manufactories, and many others which are authorized to appropriate to their use private property or interests therein.

Where there are low meadows or swampy lands, a major part of the proprietors may by statute procure them to be drained at the expense of all, including the minority of reluctant owners, and may compel the latter to forever maintain ditches through their respective lots for the common

benefit. So the owner of any land may on application to the court obtain a right to drain it by means of ditches through the premises of an adjoining proprietor upon payment of the damage. Gen. Statutes, Rev. of 1866, title 54, secs. 1, 11, 13. By a like process, and on a like condition, a person may secure a right to flood a highway by a dam erected for milling or manufacturing purposes. Gen. Statutes, title 31, sec. 21. The privilege of fishing in brooks and ponds and streams not navigable is a private right as much as the fee of the soil, and yet this right is, in part at least, constantly taken away by statutory regulations grounded upon reasons of public policy; which is another expression for benefit to neighbors on the stream or pond. These laws when attacked upon constitutional objections have been sustained for the reason that " public purposes and uses were to be promoted." *Cottrill* v. *Myrick*, 12 Maine, 222.

Very many highly important statutes affect individual rights most injuriously, but are justified by reason of public policy. Statutes of limitation indirectly take the property of one man and give it to another. The law allowing an estate held in common to be sold at auction on the petition of one who has an interest, may operate to drive the principal proprietor from his house and homestead; and yet the law is perfectly proper and necessary.

The flowage law is based upon a similar necessity. A water privilege formed by a slope extending through the lands of various proprietors is substantially a right held in common. It consists of the whole descent. One tenant owning perhaps only a bog, a rock or a sand-bank on the stream, may by his stupidity, obstinacy or inordinate greed destroy the interests, however valuable, of all the others.

In none of the cases to which we have referred does the public as an active agent take and hold and occupy the property in actual possession. The term " public use" is synonymous with public benefit or advantage. It is equivalent to the language, so familiar in our statute in relation to highways, " of common convenience and necessity."

If there were any doubt on the subject on first principles,

we understand it to be the settled law of the country that the flowing of land for the purposes of mills and manufactories, in view of its effect upon the community, is to be considered as a taking it for public use.   It would be difficult to conceive a greater public benefit than garnering up the waste waters of innumerable streams and rivers and ponds and lakes, and compelling them with a gigantic energy to turn machinery and drive mills, and thereby build up cities and villages, and extend the business, the wealth, the population and the prosperity of the state.   It is obvious that those sections of the country which afford the greatest facilities for the business of manufacturing and the mechanic arts, must become the workshops and warehouses of other vast regions not possessing these advantages; and must receive in exchange for the results of their industry and skill an abundant return of the rich products of the earth, including the precious metals.   It is of incalculable importance to this state to keep pace with others in the progress of improvements, and to render to its citizens the fullest opportunity for success in an industrial competition.

The question is asked with great pertinence and propriety, what then is the limit of the legislative power under the clause which we have been considering, and what is the exact line between public and private uses?   Our reply is that which has heretofore been quoted.   From the nature of the case there can be no precise line.   The power requires a degree of elasticity to be capable of meeting new conditions and improvements and the ever increasing necessities of society. The sole dependence must be on the presumed wisdom of the sovereign authority, supervised, and in cases of gross error or extreme wrong, controlled, by the dispassionate judgment of the courts.   In the case of *Fletcher* v. *Peck*, 6 Cranch, 128, Chief Justice Marshall says: "The question whether a law is repugnant to the constitution is at all times a question of great delicacy, which ought seldom if ever to be decided in the affirmative in a doubtful case."   It may be remarked that the justice and propriety of a flowage law is peculiarly a question

Olmstead *v.* Camp.

for legislative rather than judicial determination, although we have briefly discussed the subject on its merits.

But the defendant claims that, according to the facts found by the court, the use in this particular case is not of a public nature. Upon this point we can entertain no doubt. From the first settlement of the country grist-mills of this description have been in some sense peculiar institutions, invested with a general interest. Towns have procured them to be established and maintained. The state has regulated their tolls. In many instances they have been not merely a convenience, but almost a necessity in the community.

Upon the question whether the petitioner had a right to institute the proceedings we have as little doubt. He was the owner and the only person who could bring the petition. The fact that he had a tenant at will carrying on the establishment can make no difference.

The circumstance that the petitioner had before bringing the application raised the dam, is immaterial. His license had been revoked and the dam was left without law or right. The case must be treated as though it was not there. It would be absurd to require that the party should first pull it down and then apply for leave to put it up.

We perceive no inconsistency or irregularity in the report of the committee establishing the height of the dam, nor any error in their rulings with regard to evidence.

The report should be accepted and the doings of the committee established.

In this opinion the other judges concurred, except HINMAN, C. J., who dissented.