## H. A. BOSWORTH AND SON, INC. *v.* MITCHELL TAMIOLA ET AL.

SUPERIOR COURT  HARTFORD COUNTY  FILE NO. 131628

Memorandum filed March 5, 1963

*Shepherd, Murtha & Merritt,* of Hartford, for the plaintiff.

*Waldemar J. Lach,* of Hartford, specially for the defendants.

KLAU, J.  The complaint to which the demurrer is addressed is one brought pursuant to § 52-456 of the General Statutes and seeks authorization to drain the subdivision, described in paragraph 1, which is owned and is being developed by the plaintiff into building lots and streets, in accordance with an approved map on file, by any suitable means over or under and across the southerly and rear portions of the defendants' land, which abuts the plaintiff's property on the east.  The plaintiff alleges that it has been unable to agree on the mode of drainage and the damages to which the defendants would be entitled and thus applies for power to drain its land across the defendants' land pursuant to the aforesaid statute.

Section 52-456 provides:  "When the owner of land may wish to drain it, either by the necessary deepening or widening of a natural stream or by other means, and is unable to agree with the proprietors of adjacent lands as to the mode of draining it and the damages, he may make complaint to the superior court for the county where such land is, for power to drain it across the lands of such ad-

joining proprietors; which complaint shall be served on them in the same manner as in the case of civil actions." Section 52-457 provides in part: "[T]he court may appoint three disinterested property owners of the town where such land is situated, to determine the best mode of draining it, and the damages which will thereby accrue to the adjoining proprietors. Such property owners shall report, in writing, their doings to said court, and all persons interested therein may appear and remonstrate against the acceptance of such report, for any irregularity or improper conduct. Sections 52-458 and 52-459 provide for reassessment of damages, and § 52-460 for payment of costs. These statutes were enacted in 1853; Public Acts 1853, c. 67; Statutes, 1854, p. 786 §§ 1-7; and have come down through successive revisions to date. They form part of chapter 913 and relate to a drainage by an owner of land across land of another.

In substance, the demurrer attacks the complaint as one which contemplates a taking of property in violation of due process and as an unwarranted interference with the property and personal rights of the defendants. The demurrer further asserts that §§ 52-456—52-460, pursuant to which the plaintiff brings this complaint, are unconstitutional in that they provide an exclusive and private benefit for only the plaintiff and do not provide for any judicial finding that the drainage requested would promote the general welfare. The demurrer admits all facts which are well pleaded. *Wexler Construction Co.* v. *Housing Authority,* 144 Conn. 187, 194. While there is no allegation that the defendants refuse to permit the plaintiff to drain across their land, but merely an allegation that the plaintiff and defendants cannot agree on the mode of drainage and the damages to be paid, it may be reasonably inferred, from the allegation, that the defendants

are unwilling to permit any mode of drainage from the plaintiff's land over their own.

It is a well-settled principle of law that no law can confer upon an individual the right to take any property interest of his neighbor for his own private enhancement or gain, even though he be willing to pay damages therefor. 2 Nichols, Eminent Domain (3d Ed.) § 7.6; see *Cooley, J., People ex rel. Detroit & H.R. Co.* v. *Salem,* 20 Mich. 452. The draining of plaintiff's land over that of the defendants, against the defendants' wishes, would be an invasion of a property right of the defendants in a manner which would be unjustified unless it could be sustained as an exercise of the right of eminent domain.

Article first, § 11, of the constitution of Connecticut provides: "The property of no person shall be taken for public use, without just compensation therefor." The necessary implication of this provision is that the property of no person shall be taken for private use regardless of any procedure for compensation. Amendments V and XIV to the constitution of the United States limit both the federal government and the states from depriving any person of property without due process or taking property for public use without compensation. There are exceptions to this rule. "[C]ertain forms of assistance to private enterprise and certain methods of improving private land which have been authorized by law since the first settlement of this country and which, while not involving the seizure and occupation by one person of another's entire estate as a site for the former's works, nevertheless interfere with private property rights in a manner not ordinarily justified except as an exercise of eminent domain, and yet through the sanction of long established and unopposed practice, have been tolerated

until the present time." 2 Nichols, op. cit. § 7.612.
"This power to appropriate private property is the
eminent domain. And every species of property
which the government may require may be seized
and appropriated under this right. Cooley, Const.
Lim. (6th ed.) 646. Primarily the power to exercise
this right resides with the legislature. It is a right
which appertains to sovereignty. *Clark* v. *Say-
brook,* 21 Conn. 313, 324; *N.Y., H. & N.R.R.* v. *Bos-
ton, H. & E.R.R.,* 36 id. 196; *Goodwin* v. *Wethers-
field,* 43 id. 437, 438; 2 Hilliard on Real Property,
585; Randolph on Eminent Domain, § 99. But power
to exercise this right may be conferred by the legis-
lature on an individual, a board, or a corporation.
*Olmstead* v. *Camp,* 33 Conn. 532; *Bradley* v. *N.Y.
& N.H.R.R.,* 21 id. 294; *Eaton* v. *Boston, etc., R.R.,*
51 N.H. 504. What the legislature really does in
such cases, is to declare the public use and the ex-
istence of a public necessity for the condemnation of
land to such use, and then to confer on the indi-
vidual, the board, or the corporation, the right to
select the property which is to be appropriated to
that use. Thus, in the flowage laws, the legislature
confers the right to take land, on the individual who
desires to erect a dam. In the highway laws the
right to take land for highways is conferred on the
selectmen of the towns, or committees of the Supe-
rior Court; and in cases of railroads the right is
conferred on the corporation owning the railroad.
Cemetery associations, water companies, street rail-
ways, and other like companies, are other instances
of the same kind. In each case the legislature de-
clares the use to be a public use. The power is a
political one, or, as sometimes called, a legislative
or administrative one. When exercised by the legis-
lature, its decision of the question of public use
and as to the extent, necessity and propriety of the
taking, is ordinarily conclusive. With its decision

the courts cannot ordinarily interfere." *New York, N.H. & H.R. Co.* v. *Long,* 69 Conn. 424, 435.

The constitutionality of the flowage acts was upheld in *Olmstead* v. *Camp,* 33 Conn. 532, and in the course of its opinion (p. 549) the court stated with respect to the constitutionality of the predecessor of § 52-456 (Rev. 1866, p. 662, § 13) the following: "Where there are low meadows or swampy lands, a major part of the proprietors may by statute procure them to be drained at the expense of all, including the minority of reluctant owners, and may compel the latter to forever maintain ditches through their respective lots for the common benefit. So the owner of any land may on application to the court obtain a right to drain it by means of ditches through the premises of an adjoining proprietor upon payment of the damage. *Gen. Statutes, Rev. of* 1866, *title* 54, *secs.* 1, 11, 13." The court (p. 546) also defined the term "public use" as contained in article first, § 11, of the state constitution, giving it a broad construction. It rejected the defendants' contention that the term "public use" means "possession, occupation, direct enjoyment, by the public. Or in other words that the property must be literally taken by the public as a body into its direct possession and for its actual use, as in the instances of a state-house, a court-house, a fort, an arsenal, a park, etc. It seems to us that such a limitation of the intent of this important clause would be entirely different from its accepted interpretation, and would prove as unfortunate as novel. One of the most common meanings of the word 'use' as defined by Webster, is 'usefulness, utility, advantage, productive of benefit.' 'Public use' may therefore well mean public usefulness, utility or advantage, or what is productive of general benefit; so that any appropriating of private property by the state under its right of eminent domain for pur-

poses of great advantage to the community, is a
taking for public use. Such, it is believed, is the
construction which has uniformly been put upon the
language by courts, legislatures and legal author-
ities."

In enacting the original Drainage Act in 1853,
the General Assembly may well have concluded, in
the light of the contemporaneous broad construc-
tion given to the term "public use" as contained in
the constitution, and in the light of the established
usages of the period, that the exercise of the right
of eminent domain under the Drainage Act by
private individuals would promote the general wel-
fare and be of great advantage to the community.
The dictum of the court with respect to the con-
stitutionality of the Drainage Act heretofore set
forth and as expressed in *Olmstead* v. *Camp,* supra,
549, was based on the same conclusions. These
legislative and judicial pronouncements reflect the
social and economic background of the community.
"There are statutes in many of the older states and
in some of the newer providing that if the owner
of a swamp or low land cannot make use of it with-
out constructing a drain outside the limits of his
own land, he may establish the necessary drain on
adjacent land, paying its owner damages. . . . But
it is contrary to the fundamental principles of con-
stitutional law to allow one man to take his neigh-
bor's property so that he may cultivate his own
land to better advantage. Nevertheless, such is the
force of established usage, and of contemporaneous
construction of the constitution, that private drain-
age acts have been sustained in several states on
the ground that they promote the public welfare.
The only ground upon which the private drainage
acts can stand, in the absence of special constitu-
tional authority, is their age. When first passed the
wild and unimproved land was of little value and

subject to all sorts of unopposed trespasses. The construction of a ditch or dyke through such land by a neighboring owner would not seem a gross violation of property rights. But under present conditions, in a state in which a general reclamation of swamps is not a matter in which the community is deeply concerned, it does not seem that such statutes can be upheld without frankly admitting that long usage and practice contemporary with the adoption of the constitutions is not merely an aid in interpreting ambiguous language in that instrument but that it overrides the plain and literal meaning of its words—an admission that would make easier the task of the courts and the text writers in defining public use and in reconciling the cases which bear upon the meaning of that phrase." 2 Nichols, Eminent Domain (3d Ed.) § 7.6223 [1] pp. 578-581.

At the present time, the exercise of the right of eminent domain by an owner of land for drainage over adjacent land pursuant to §§ 52-456—52-460 may no longer be, in every instance, of general benefit or great advantage to the community. In many situations, the right may be sought primarily for private enhancement or gain, with only such incidental general benefit or community advantage as might accrue from any successful private endeavor. Thus it is possible for the foregoing Drainage Act to operate constitutionally in one situation and unconstitutionally in another. *State* v. *Sul*, 146 Conn. 78, 81. The act might be upheld as constitutional if the drainage contemplated involved the drainage of a swamp or a lowland, or drainage of a swamp to abate a nuisance; see 2 Nichols, op. cit. §§ 7.622, 7.6221; and yet be unconstitutional if the drainage involved is primarily to permit the plaintiff to secure drainage for the purposes of selling his building lots at a cheaper price than otherwise.

It is, of course, conceivable that the power of eminent domain granted by § 52-456 may be abused in certain circumstances. There may be some attempts to use it for some ulterior purposes not contemplated by the act; *Gohld Realty Co.* v. *Hartford,* 141 Conn. 135, 145; but this can be determined after a full hearing. When a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear. *Snyder* v. *Newtown,* 147 Conn. 374, 390.

The nature of the plaintiff's land is not clear from the complaint, nor is the method of drainage which is proposed. It is desirable that all of the facts be made available before determining whether the drainage sought in the present case is constitutionally appropriate. It may well be that the appropriate time to determine the question of the constitutionality of §§ 52-456—52-460 is after a remonstrance to the acceptance of the report, as provided for under § 52-457. See *Olmstead* v. *Camp,* 33 Conn. 532, 538.

A demurrer is to be tested by the allegations of the pleadings demurred to, which cannot be enlarged by the assumption of any fact not therein alleged. *Wexler Construction Co.* v. *Housing Authority,* 144 Conn. 187, 194. Under all of the circumstances, the constitutionality of the Drainage Act cannot be satisfactorily determined on the demurrer.

Accordingly, the defendants' demurrer to the complaint is overruled.