137 F.2d 201 (1943)
DAVIES WAREHOUSE CO.
v.
BROWN, Price Administrator.
No. 5.
United States Emergency Court of Appeals.
Heard January 25, 1943.
Decided May 28, 1943.
Writ of Certiorari Granted October 11, 1943.
*202 Reginald L. Vaughan, of San Francisco, Cal., for complainant.
W. R. Ming, Jr., of Washington, D. C. (David Ginsburg, General Counsel, Thomas I. Emerson, Associate General Counsel, Nathaniel L. Nathanson, Assistant General Counsel, Ben W. Heineman, Chief, Court Review Branch, and Carl H. Fulda and H. H. Schneider, Attorneys, Office of Price Administration, all of Washington, D. C., on the brief), for respondent.
Before VINSON, Chief Judge, and MARIS and MAGRUDER, Judges.
Writ of Certiorari Granted October 11, 1943. See 64 S.Ct. 40, 88 L.Ed. ___.
MARIS, Judge.
Complainant conducts the business of a public warehouse in the City of Los Angeles, California. Its business is declared by both constitution[1] and statute[2] of California to be that of a public utility subject to regulation by the railroad commission of the state. That regulation includes the fixing of rates and charges of the complainant. Pursuant to the California statute the railroad commission on May 12, 1942 authorized complainant to make an increase in its existing rates, effective May 22, 1942.
On April 28, 1942 the Price Administrator acting under the authority conferred upon him by the Emergency Price Control Act of 1942 issued a General Maximum Price Regulation[3] which fixed as seller's maximum prices for any commodity or service the highest price charged by him during the month of March, 1942. Section 10 of the regulation, as amended,[4] provided that it should not apply to such services as might be specified by supplementary regulations or amendments thereto.
Section 302(c) (2) of the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix § 942(c) (2), provides: "(c) The term `commodity' * * * includes services rendered * * * in connection with the * * * storage * * * of a commodity, or in connection with the operation of any service establishment for the servicing of a commodity: Provided, That nothing in this Act shall be construed to authorize the regulation of * * * (2) rates charged by any common carrier or other public utility * * *."
On June 18, 1942 the Price Administrator issued Supplementary Regulation No. 11[5] by which it was declared that the General Maximum Price Regulation would not apply to certain services until July 1, 1942. Among the services thus treated were "(2) Commercial Storage and warehousing and services incident thereto." On June 25, 1942 the Price Administrator issued Amendment No. 1[6] to Supplementary Regulation *203 No. 11 providing for the exception of certain services from the operation of the General Maximum Price Regulation, effective July 1, 1942. Of the services thus excepted the only ones partaking of the nature of a common carrier or other public utility were the following:
"(21) Electricity (companies furnishing as public utilities), rates charged by

* * * * * * *
(25) Express companies and freight forwarders offering their services to the general public as common carriers, rates charged by

* * * * * * *
(30) Gas (companies supplying, as public utilities through mains), rates charged by

* * * * * * *
(38) Light, heat, or power (companies furnishing, as public utilities), rates charged by

* * * * * * *
(61) Telephone services, rates charged for
(62) Telegraph service, rates charged for

* * * * * * *
(68) Transportation of commodities by persons offering their services to the general public as common carriers by rail, water, motor, pipe line, or other means of conveyances, rates charged for: Provided, however, that charges for storage and warehousing and all other services incident thereto by any person shall not be excluded from the General Maximum Price Regulation.
(69) Transportation of persons, rates charged for

* * * * * * *
(73) Water (companies supplying, to urban areas as public utilities), rates charged by."
The effect of the General Maximum Price Regulation, the Supplementary Regulation and the amendment, as applied to the complainant, was to prohibit it after July 1, 1942 from taking advantage of the rate increase which had been allowed to it by the California Railroad Commission two months previously. Asserting itself to be a public utility within the meaning of the exemption of "any common carrier or other public utility" set forth in Section 302(c) (2) of the act and therefore aggrieved by the failure of the Price Administrator to exempt its business from the General Maximum Price Regulation, the complainant filed a timely protest with the Price Administrator. The Price Administrator denied the protest and the complainant filed the present complaint asking this court to set aside the General Maximum Price Regulation, Supplementary Regulation No. 11 and Amendment No. 1 thereto insofar as they purport to regulate the charges of the complainant.
It is the contention of the complainant that the words "any common carrier or other public utility" as used in the exemption clause of section 302(c) (2) of the act mean any common carrier or other public utility which is designated as such by existing law and regulated as to its rates by existing federal, state or municipal authority. The Price Administrator contends, on the other hand, that the interpretation of these words is not dependent on state law, but that they must be given a uniform effect throughout the United States and must therefore be deemed to refer to all common carriers and other public utilities generally and traditionally recognized as such without regard to whether in a particular state they are or are not subject to rate regulation by statutory authority. It is the Price Administrator's further contention that the business of a public warehouseman is not a public utility in this sense, even though in California it is by statute described and regulated as such. Consequently, he says, the complainant is not entitled to exemption from his price regulation as a public utility and its complaint should be dismissed.
The question thus presented for our decision is as to the meaning to be given to the words "any common carrier or other public utility" in the exemption clause of the act. Are these words to be given their natural and ordinary meaning and applied uniformly throughout the nation or are they to be deemed to refer only to those businesses which have been designated as common carriers or public utilities by some other law and which have been made subject to rate regulation by existing federal, state or local authorities? If the former, do they include the business of a public warehouseman? It will first be observed that neither "common carrier" nor "public utility" is defined by the act. There is no contention that the complainant is a common carrier. Consequently that phrase need concern us no further. Accordingly we must proceed to ascertain the concept which the Congress had in mind in using the phrase "public utility" in the exemption clause of the act.
It need hardly be pointed out that the act was passed in the emergency of war *204 to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices. The threatened danger of disastrous inflation was and is nationwide and not local in character and the evident purpose of the act was to empower the Price Administrator to take needed action to combat it on a national scale. In this setting there is especially cogent reason for the application of the well established rule that descriptive terms used in a federal statute will, in the absence of language in the statute indicating a contrary intent, be given a general and uniform interpretation throughout the country.[7] The same considerations make equally applicable the rule that exceptions to a general policy embodied in a law should be strictly construed.[8] Here there is no indication that the Congress intended that the Price Administrator's power to fix the prices charged by a business should be dependent upon whether or not in the state in which the business was carried on it was described as a public utility and regulated as such. Particularly in the light of the wide variety of businesses which have been designated and regulated as public utilities in some of the states[9] there is compelling force in the Price Administrator's argument that under such an interpretation of the act unjustified economic preferences, regional competition and other evils might well result. Likewise we find no indication that the Price Administrator was intended, as the complainant argues, to fix the rates of all common carriers and other public utilities whose rates are not otherwise regulated[10].
We find in the act other indications of the Congressional intent that its application should be uniform throughout the country. Thus we observe that the exceptions to the broad sweep of the coverage of the act which appear in the proviso *205 to Section 302(c) are very few in number. Then also the act expressly deprives all existing courts, federal and state, of jurisdiction to review the Price Administrator's regulations and confers sole jurisdiction in that field upon this court; a plain indication that Congress intended that a single standard of review of price regulations should be applied uniformly throughout the nation.
But even more persuasive is the fact that the exemption clause is wholly devoid of any qualifying language which would indicate that the Congress intended it to have a varying local application. The Congress did not, as it might have done,[11] say that the public utilities which were to be exempt from the operation of the act should be those businesses, and those alone, which were deemed to be public utilities and subject to rate regulation as such under existing federal or state law. Furthermore we think that such a definition of the term "public utility" would have extended its meaning far beyond anything that the Congress could have had in mind. For the use of the term by some of the states has been so broadened that in one of them, to cite an extreme case, it is defined to include "every corporation, or person now or hereafter declared by law to be affected with a public interest."[12] But it is settled that the mere exercise of a state's power to regulate the rates and charges of a particular business which the state deems to be affected with a public interest does not constitute such a business "in the accepted sense of the phrase, a public utility." Nebbia v. New York, 1934, 291 U.S. 502, 531, 54 S. Ct. 505, 513, 78 L.Ed. 940, 89 A.L.R. 1469.
The legislative history of the act also lends support to the view that the Congress intended to exempt from the operation of the act all public utilities even though not subject to other existing regulation. Thus in the hearings before the House Committee on Banking and Currency the following testimony was given by Leon Henderson, then acting as Administrator of the Office of Price Administration and Civilian Supply under Executive Order:[13]
"Mr. Henderson. * * * Now, as to the utilities. There is, as the members are aware, an adequate set of regulations as to the charges which utility companies can make. These, again, are based upon a long series of judicial determinations, of State regulations, and of State laws. It seemed to those drafting the bill that this was an area which was not likely to give difficulty or to cause, so far as they could see at that time, any inflationary trend. The bill is designed to control an emergency inflationary situation and has left them out, just as it has transportation rates. There are questions peculiar to utilities and none of them, so far as I see at the present time, would make necessary further regulation by means of a price-control bill."

* * * * * * *
"Mr. Patman. I do not care for an extended answer, unless you think it is necessary to give it.
"You include in this bill metals, chemicals, durable goods, and agricultural products, and you also include services in the bill except, of course, that it does not apply to wages and salaries paid by an employer to an employee; but otherwise services are included. But it does not include transportation or utility rates.
"Mr. Henderson. No.
"Mr. Patman. That is quite a large item, and you said, as I understood you, that you were satisfied with the rate-making bodies in the States, and that that was the reason you did not ask that utility and transportation rates be included.
"Do I understand that correctly?
"Mr. Henderson. I did not mean to limit it to existing regulatory mechanisms both in transportation and utilities.
"What I said was that the transportation rates themselves were already under regulation by Federal and State agencies, and I also feel that that is not an item, even in the absence of that regulation, to be brought under commodity price regulation."
In the House of Representatives Representative Steagall, the Chairman of the Committee on Banking and Currency, who was in charge of the bill on the floor, said:[14] "Mr. Steagall. The bill also provides explicitly *206 in section 302(c) that nothing in the act is to be construed to authorize the regulation of compensation paid by an employer to any of his employees, or the regulation of rates charged by any common carrier, or other public utility, which are usually subject to adequate control by State or other Federal agencies. In cases of conflict between State regulation of enterprise of a non-public-utility character and Federal regulation under this bill, the Federal regulation would, of course prevail."
We think these statements indicate that what the Congress had in mind was the exemption of all public utilities as ordinarily understood. From the statements of both Mr. Henderson and Mr. Steagall it is evident that they contemplated that some of the public utilities which they proposed to exempt might not be presently subjected to other rate regulation. Nevertheless it was thought that the public utilities did not present a serious price control problem "even in the absence of that regulation." In reaching this conclusion the Congress may well have had in mind what Mr. Henderson's testimony suggested, namely, that public utility rates "are based upon a long series of judicial determinations" even though not subject to statutory regulation. For it is well established that at common law a business of a public nature and invested with a monopoly was under the duty of furnishing its service to the public at reasonable rates.[15] And this duty has been enforced in equity.[16] Consequently it was entirely reasonable to leave out of the price fixing procedure set up by the statute the whole area of public utility rates, since most of them were already subject to statutory regulation and the remainder were limited by fixed principles of law.
Finally we cannot overlook the fact that by Amendment No. 1 to Supplemental Regulation No. 11, the Price Administrator granted complete exemption to nine classes of common carriers and other public utilities without any regard to their status as to existing rate regulation. This contemporaneous administrative construction of the scope of the exemption appears to have met with the approval of the Congress, for in Section 1 of the amendatory act of October 2, 1942, Chap. 578, 2d Sess. 77th Cong., 50 U.S.C.A.Appendix, § 961,[17] the words "common carrier or other public utility" are again used without qualifying language. It is true, as the complainant says, that these words were used in connection with a provision requiring a public utility making a general increase in rates to give notice to a federal agency and to consent to the intervention of the agency "before the Federal, State, or municipal authority having jurisdiction to consider such increase." But this clause must be considered in the light of the fact that the provision was intended to give to the federal authorities an opportunity to prevent undue increases in utility rates in cases in which no such opportunity was afforded by the original act. The provision was substituted in conference for an amendment by Senator Norris which would have given the President veto power over such increases.[18] In view of its purpose to extend the area of federal action it can hardly be construed as at the same time intended to restrict that area by enlarging the original exemption of public utilities so as to include in the exempt class all those businesses which are described and regulated as public utilities under the statutes of any state. The act must rather be considered in the light of the fact that the traditional *207 public utilities are almost universally subject to statutory rate regulation and if not are subject to a common law duty to maintain reasonable rates which duty is enforceable by the courts. Indeed the courts may well be included among the state authorities having jurisdiction to consider rate increases before which the act provided that the federal agency should be given the right to intervene.
We conclude, therefore, that the exemption of public utilities by Section 302(c) (2) was intended to have a uniform meaning and effect throughout the United States without regard to the provisions of state law, and that the fact that the complainant is designated as a public utility by the constitution and laws of California is not determinative of its right to the exemption. The question remains whether a public warehouseman, such as the complainant, is a public utility within the uniform nationwide meaning which is to be given to that term as it is used in the Emergency Price Control Act.
Our investigation indicates that the use of the phrase "public utility" in the sense in which we are now considering it is of comparatively recent origin.[19] The data which we have considered do not disclose any clear criteria from which a precise definition of the phrase "public utility" may be constructed. It is suggested that one of the elements is the enjoyment of a public franchise to carry on the business in question. It is clear, however, that public franchises may also be held by those whose activities are public utilities solely in the sense that they are state regulated. Certainly any person who is by statute authorized to operate his business only upon receipt of a state issued certificate of convenience and necessity may be said to have a franchise from the state. Then again it is urged that monopoly and its attendant lack of competition are essential marks of a public utility. But while monopoly and lack of competition are present in the case of some undoubted public utilities, there are others, carriers by motor vehicle for example, whose business is highly competitive.
Finally it is suggested that the legal duty to serve without discrimination all those who desire the service is the unmistakable badge of a public utility. While all public utilities doubtless have such a duty it is by no means confined to them. Thus innkeepers, who have nowhere been described as public utilities, have from early times been subject to the obligation to receive and afford proper entertainment to every one who offers himself as a guest, if there be sufficient room for him in the inn, and no good reason for refusing him.[20] Nor is the concept of one engaged in a public employment of assistance. At common law the surgeon, the tailor, the smith, the victualer, the baker, the miller, the innkeeper, the carrier, the ferryman and the wharfinger were considered to be engaged in public employment[21] yet the first seven of these have never been suggested as coming within the definition of public utility.
Some light is thrown upon the question whether a public warehouseman is a public utility within the meaning of the act by the language of the act itself. As we have seen, the very section which contains the proviso exempting public utilities states that the term "commodity" as used in the act "includes services rendered * * * in connection with the * * * storage * * * of a commodity." Here is definite indication that storage of commodities, the business of a public warehouseman, is intended to be covered by the act. In the hearings upon the bill and in its consideration upon the floor of the Senate the public utilities referred to as involved in the proposed exemption included electric, gas, water and telephone companies but no mention was made of public warehousemen.
It is a fundamental rule of statutory construction that in the absence of a statutory definition words used in the statute are to be given their natural and ordinary meaning.[22] Among the data to be considered in determining the natural and ordinary meaning of "public utility" is the manner in which the term has been used in state legislation.[23] Electric, gas, light, heat, power, water, telephone and telegraph companies *208 which the Price Administrator has treated as exempt public utilities are enterprises of the types which are now almost universally treated as public utilities for the purpose of regulation under state statutes. They are generally classified as public utilities in the manuals used by the financial community.[24] On the other hand only three states include all warehouses in their statutory definition of public utilities,[25] while seven others include limited types of warehouses.[26] Thirty-eight states and the District of Columbia do not define warehouses of any kind as public utilities. In the financial manuals warehouse companies are classified as industrials.[27]
Complainant points to the decision of the Supreme Court in Munn v. Illinois, 1876, 94 U.S. 113, 126, 24 L.Ed. 77, which held that the rates of a public warehouseman were subject to regulation by a state and it argues that its business was thereby adjudicated to be a public utility. The decision in the Munn case was based upon the proposition that such a business was "affected with a public interest" and consequently its charges might be regulated by the state under the police power without violation of the Fourteenth Amendment. The court did not discuss the question as to whether the business was a public utility. Indeed that term was not used in the opinion. We need not here enter the interesting controversy as to whether the use in that decision of Sir Matthew Hale's concept of a business "affected with a public interest" was appropriate,[28] for the concept has subsequently been broadened by the Supreme Court to be the equivalent of "subject to the exercise of the police power."[29] It follows that today a purely private business which has no franchise from the state and enjoys no monopoly may be subject to price regulation as a business affected with a public interest if a reasonable basis for such action can be shown. As the court said in the Nebbia case, 291 U.S. at page 536, 54 S.Ct. at page 515, 78 L.Ed. 940, 89 A.L.R. 1469. "The phrase `affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good."
Pursuant to this broader concept of the police power many of the states have in recent years widely extended the area of price regulation. In so doing, as in the case of California with public warehousemen, they have frequently described the businesses thus regulated as public utilities. Whether this was in the mistaken belief that it was necessary to so designate them in order to bring them within the police power is not material, for it is obvious that this greatly widened field of regulated business could not have been intended by Congress to be comprehended within the meaning of the phrase "public utility" as used in the act. Such a construction would remove from the jurisdiction of the Price Administrator a major portion of the field of price regulation and make the exemption clause the rule rather than the exception. Indeed, it may be said that the Emergency Price Control Act itself is a Congressional determination that, at least in wartime, every business in the country is so affected with a public interest as to require statutory control of its prices.
Professor (now Justice) Frankfurter in his book "The Public and its Government" (1930) p. 81, lists as typical public utilities those enterprises "which furnish, light, heat, power, water, transportation, and communication." These, as we have seen are the types of business which the Price Administrator has exempted as public utilities. We think that the Congress intended by the phrase "public utility" to comprehend enterprises of these general types. We are not called upon, however, to delimit the entire area which *209 the term was intended to cover, but merely to decide whether a public warehouseman is within it. After consideration of all the relevant data we conclude that a public warehouseman operating under the California law is not a "public utility" within the meaning of Section 302(c) (2) and as such exempt from the General Maximum Price Regulation promulgated by the Price Administrator. It follows that the latter committed no error in denying the complainant's protest.
The complaint is dismissed.
MAGRUDER, Judge (concurring).
With some hesitation, I concur in the result reached by Judge Maris. This is one of those unfortunate cases where doubts would remain whichever way the case was decided.
Judge Vinson in his dissenting opinion has amply demonstrated that complainant has the characteristics of a "public utility" within the connotation of that phrase in widespread usage. He treats the phrase as one of art, and so treating it, he is sure only of this, if I understand him correctly: that a business is a "public utility" if it has all four of the characteristics mentioned, and if, in addition, its rates are actually being regulated by some administrative agency. He does not decide whether a business would be exempt within the meaning of § 302(c) if its rates were not in fact being regulated by some governmental agency, even though it had the four described characteristics. And he suggests the possibility that a business might be deemed a "public utility" even though not possessing one or another of the four characteristics  for instance, if the business, though possessing the other earmarks, did not bear an intimate connection with the process of transportation and distribution, or was not required to obtain a certificate of convenience or necessity before entering the field.
If Judge Vinson's view were accepted, the Price Administrator would have a formidable preliminary task before issuing price regulations applicable to a great variety of businesses. He would have to decide what are the indispensable characteristics of a "public utility"  a phrase which Judge Vinson, after exhaustive research, concedes to be "freighted with refinements" and "not susceptible of a precise definition." Then the Administrator would have to scrutinize the statutes of the forty-eight states to see what businesses have had impressed upon them by local law the characteristic obligations of a public utility. Nor would his investigation end there; Judge Vinson points out that the due process clause limits "the power of the states to create public utilities," and the Administrator would have to wrestle with the application of the Supreme Court's decision in New State Ice Co. v. Liebmann, 285 U. S. 262, 52 S.Ct. 371, 76 L.Ed. 747.
But I think a candid examination of the legislative history indicates that Congress in § 302(c) was probably not using "public utility" as a term of art; if it had been, Congress would hardly have left without precise definition so elusive a phrase. Congress was, I am inclined to think, using the term loosely and somewhat vaguely as comprehending the familiar and garden variety businesses which would immediately suggest themselves to the lay mind when the phrase "public utility" is used, and which universally, or almost universally, are under existing federal, state or municipal rate regulation. In these circumstances we should attach persuasive weight to the official interpretation of the exemption in § 302(c) made shortly after the passage of the Act by the administrative official who sponsored the legislation and upon whom Congress imposed the duty of carrying it out. It is significant in this connection, as pointed out by Judge Maris, that after the Administrator made his contemporaneous interpretation of the scope of the exemption, Congress in § 1 of the amending act of October 2, 1942, 56 Stat. 765, again used the words "common carrier or other public utility" without qualifying language.
Judge MARIS concurs in the foregoing views.
VINSON, Chief Judge (dissenting).
The Emergency Price Control Act of 1942, as amended (the Price Act), contains a provision[1] which specifically exempts the rates charged by "any common carrier or other public utility" from regulation by respondent, the Price Administrator. The term, "public utility" is not defined or otherwise explained in the Act. The hearings and debates in Congress have not provided *210 specific guidance as to the comprehensiveness with which the term was employed.
In the present controversy the complainant, which conducts the business of a public warehouse in the City of Los Angeles, California, contends that it is a "public utility," and, therefore, entitled to exemption from rate control under the terms of the Act.
The relevant portions of the Price Act are Section 2(a), which authorizes the respondent to issue price regulations for commodities whose price has arisen or threatens to rise in a manner inconsistent with the purposes enumerated in Section 1(a)[2] of the Act, together with Section 302(c) (2) which provides that
"* * * The term `commodity' * * * includes services rendered * * * in connection with the processing, distribution, storage * * * of a commodity: Provided, That nothing in this Act shall be construed to authorize the regulation of * * * (2) rates charged by any common carrier or other public utility * * *."[3] (Italics supplied)
By virtue of the aforesaid authorization, the Price Administrator on April 28, 1942, issued a General Maximum Price Regulation[4] which fixed as a seller's maximum price the highest price charged by him during the month of March, 1942. Section 10 of the Regulation[5] provided that it should not apply to such services as might be specified by supplementary regulations or amendments thereto. On June 18, 1942, the Price Administrator issued Supplementary Regulation No. 11,[6] by which it was declared that the General Maximum Price Regulation (issued in April) would not apply to certain services until July 1, 1942. Among the services thus treated were "(2) Commercial storage and warehousing and services incident thereto." On June 23, 1942, the Price Administrator issued Amendment No. 1[7] to Supplemental Regulation No. 11, providing for the exception of certain services from the operation thereof. Among the services thus excepted were all electricity, gas, light, heat, power, and water companies which were furnishing or supplying "as public utilities." In addition, the Amendment provided the following exemption:
"(68) Transportation of commodities by * * * common carriers by rail, water, motor, pipe line, or other means of conveyances, rates charged for: Provided, however, That charges for storage and warehousing and all other services incident thereto by any person shall not be excluded from the General Maximum Price Regulation." (Italics supplied.)
The upshot of this series of regulations was to place complainant in a position wherein it would be prohibited after July 1, 1942, from taking advantage of a rate increase for its warehousing services which had been allowed by the California Railroad Commission two months previously. Asserting itself to be a public utility within the meaning of the exemption set forth in Section 302(c) of the Act, and therefore aggrieved by the failure of the Price Administrator to exempt its business from the General Maximum Price Regulation, the complainant filed a timely protest[8] with the Price Administrator. The Price Administrator denied the protest, and the complainant filed the present complaint asking this court to set aside the General Maximum Price Regulation. Supplementary Regulation No. 11, and Amendment No. 1 thereto, insofar as they purport to regulate the charges of the complainant.
The parties agree that, in the absence of statutory definition or other means of attaining the legislative intention, the term "public utility," as used in the Act, must be given its natural and customary significance. We are obliged to determine, in a measure, this connotation.
The term "public utility" is not susceptible of a precise definition. It is a concept of comprehensive content, freighted with refinements, and one whose determination for general application is beyond the scope of this opinion. Fixing its formula has been frequently dodged. It is not our purpose or need, however, to develop the definition to a conclusion  to present a workable *211 formula or pattern by which any business may be gauged and labeled.
I do not regard a public utility as having any tangible existence; it is like a corporation in that respect. The concept "public utility" is, as I see it, merely a bundle of attributes or characteristics, and our problem, here, simply stated is first to consider some of the fundamental attributes which comprise that bundle and, then, to see if these attributes have been applied, affixed, or adopted as regards the complainant's public warehouse.

I. A Public Utility is, at the least, a Business Affected with a Public Interest.
In the narrowing process of determining which of the countless enterprises extant are public utilities, I think that the most appropriate spring board is that principle contained in the landmark case of Munn v. Illinois.[9] A public utility is, at the least, a business affected with a public interest.[10] A "business affected with a public interest," however, is a concept no more concise than the one with which we are concerned. It has been described as a business which bears such a peculiarly close relation to the public that there arises an affirmative obligation upon the part of the operators to be reasonable in dealing with their customers.[11] It has been designated as a business wherein exist peculiar conditions bearing such a substantial and definite relation to the public interest as to justify an indulgence of the legal fiction of a grant by the owner to the public of an interest in the use,[12] and permitting the imposition of governmental regulation. Thus although the property continues to be private, the public has attained an interest. It has been observed that there is perhaps not a single business which may not be subjected to some measure of public regulation.[13] It is simply a question of the character and degree of the control, and an activity properly designated as "affected with a public interest" is subject to more extensive regulation. The mere declaration by the legislature, however, that a business is affected with a public interest is not conclusive; the attempted regulation is always a subject of judicial inquiry,[14] the due process clause being the staying hand.[15]
Some clarification of the concept is found in Wolff Packing Co. v. Court of Industrial Relations,[16] wherein the Supreme Court said:
"It is very difficult under the cases to lay down a working rule by which readily to determine when a business has become `clothed with a public interest.' All business is subject to some kinds of public regulation, but when the public becomes so peculiarly dependent upon a particular business that one engaging therein subjects himself to a more intimate public regulation is only to be determined by the process of exclusion and inclusion and to gradual establishment of a line of distinction. * * * To say that a business is clothed with a public interest is not to determine what regulation may be permissible in view of the private rights of the owner. The extent to which an inn or a cab system may be regulated may differ widely from that allowable as to a railroad or other common carrier. It is not a matter of legislative discretion solely. It depends on the nature of the business, on the feature which touches the public, and on the abuses reasonably to be feared. To say that a business is clothed with a public interest is not to import that the public may take over its entire management and run it at the expense of the owner. The extent to which regulation may reasonably go varies with different kinds of business. The regulation of rates to avoid monopoly is one thing. The regulation of wages is another. A business may be of such character that only the first is permissible, *212 while another may involve such a possible danger of monopoly on the one hand, and such disaster from stoppage on the other, that both come within the public concern and power of regulation."
No particular manner of operation or form of state control seems to be a requisite characteristic of a business affected with a public interest. It has been held that a business was impressed with a public interest even though the public might not have the right to demand and receive service.[17] The enjoyment of a monopolistic status is clearly not necessary.[18] Similarly it has been held that a business need not be dependent upon a franchise, certificate of public convenience and necessity, or other form of grant, in order to be clothed with a public interest.[19]
What, then, is it which distinguishes a public utility from a mere business affected with a public interest? The informing opinion of Wolff Packing Company v. Court of Industrial Relations has drawn a formal comparison and distinction which divides public businesses into three classes:
"(1) Those which are carried on under the authority of a public grant of privileges which either expressly or impliedly imposes the affirmative duty of rendering a public service demanded by any member of the public. Such are the railroads, other common carriers and public utilities.
"(2) Certain occupations, regarded as exceptional, the public interest attaching to which, recognized from earliest times, has survived the period of arbitrary laws by Parliament or Colonial Legislatures for regulating all trades and callings. Such are those of the keepers of inns, cabs and grist mills. * * *
"(3) Businesses which, though not public at their inception, may be fairly said to have risen to be such and have become subject in consequence to some government regulation. They have come to hold such a peculiar relation to the public that this is superimposed upon them. In the language of the cases, the owner by devoting his business to the public use, in effect grants the public an interest in that use and subjects himself to public regulation to the extent of that interest although the property continues to belong to its private owner and to be entitled to protection accordingly. * * *"[20] (Italics supplied)
This oft-cited passage from the Wolff case purports to do no more than outline some of the fundamental distinctions between a public utility and a business affected with a public interest. It is necessary to develop those fundamental differences in order to appreciate fully the multiple refinements of the former concept.

II. The Nature of the Enterprises in the Public Utility Family.
The concept "public utility," contemplates more than a business affected with a public interest.[21] To the date of my observation, at least, it has been limited in its application to only a particular class of public businesses. Because the explanation of this limitation is of historical origin, perhaps the best insight is afforded by referring, in brief, to the emergence and expansion of the public utility family. It is clear that the common carrier, by virtue of what was accepted as its duties and obligations to the public at common law, was the Adam of this family, and that the members thereof grew as the common carrier concept was extended. Transportation thus furnished the point of departure, and the list grew by analogy.[22] Congress may have recognized this intimate connection when it grouped "common carrier[s] and other public utilitie[s]" (italics supplied) into a single exemption in Section 302(c).
The participation by a business in activities intimately connected with the processes of transportation and distribution, *213 therefore, was the characteristic which caused it to be subjected to the impositions implicit in public utility regulation. A somewhat exhaustive enumeration of the businesses which frequently have been designated, operated, and regulated as public utilities illustrates that the gradual growth of the family has involved no departure from the initial concept, but merely reflected scientific progress in the facilities, auxiliaries, and varieties of transportation and distribution: viz., bridges, buses, canals, cotton gins, docks, electric companies, elevators, express companies, ferries, gas companies, heating companies, pipe lines, public warehouses, railroads, stockyards, truck lines, telegraphs, telephones, water companies, wharfingers, vessels, etc.
As supplying Supreme Court recognition of this approach, the language of Lamar, J., dissenting in the Supreme Court decision of German Alliance Ins. Co. v. Superintendent of Ins. of State of Kansas,[23] is significant:
"* * * And as further pointing out the characteristics of the public use justifying the fixing of prices, it will be noted that * * * they all have direct relation to the business or facilities of transportation or distribution  to transportation by carriers of passengers, goods, or intelligence by vehicle or wire; to distribution of water, gas, or electricity through ditch, pipe, or wire; to wharfage, storage, or accommodation of property before the journey begins, when it ends, or along the way.
"When thus enumerated, they appear to be grouped around the common carrier as the typical public business, and all employing in some way property devoted to a public use." (Italics supplied)
On the other hand, such decisions of the Supreme Court as those holding the business of selling milk[24] and insuring against fire losses[25] to be affected with a public interest illustrate the proposition that, as regards a mere business affected with a public interest, the traditionally close association with transportation and distribution service is not a necessary characteristic.

III. For an Enterprise to be Constituted a Public Utility, Its Services Must be Made Available Upon Demand at Reasonable and Non-Discriminatory Rates.
An examination of numerous decisions wherein Federal and State courts have had occasion to consider the nature and the characteristics of public utility enterprises reveals that a distinguishing feature of that class of businesses is considered to be the presence of an obligation to serve the public upon demand[26] at reasonable[27] and *214 non-discriminatory[28] rates. In considering a particular business, the greatest emphasis is repeatedly placed upon these characteristics. In Parsons v. Detroit & Canada Tunnel Co.,[29] to select one of the many expressions, a Federal court said:
"A public utility is generally known in the law as a business organization which regularly supplies the public with some commodity or service. The distinguishing characteristic of a public utility is the devotion of private property by the owner * * * to such a use that the public generally, or that part of the public which has been served and has accepted the service, has the right to demand that the use or service, so long as it is continued, shall be furnished without unreasonable discrimination with reasonable efficiency and under proper and reasonable charges." (Italics supplied)
In Nebbia v. New York,[30] in denying that a dairy was a public utility "in the accepted sense," the Supreme Court spoke of a public utility as "* * * a business * * * in which property is devoted to an enterprise of a sort which the public itself might appropriately undertake, or one whose owner relies on a public grant or franchise for the right to conduct the business, or in which he is bound to serve all who apply * * *." (Italics supplied)
In Pulitzer Pub. Co. v. Federal Communications Commission,[31] the United States Court of Appeals for the District of Columbia denied public utility status to radio broadcasting companies, observing that "* * * we have never said that a radio broadcasting station is a public utility in the sense in which a railroad is a public utility. Generally speaking, that term comprehends any facility employed in rendering quasi public service such as waterworks, gas works, railroads, telephones, telegraphs, etc. The use and enjoyment of such facilities the public has the legal right to demand; but its right to the use and enjoyment of the facilities of a privately owned radio station is of a much more limited character. * * * The licensee of a radio station chooses its own advertisers and its own program." (Italics supplied)
In the California decision of Allen v. Railroad Commission,[32] the court, in discussing the public utility concept, dealt, for purposes of illustration, with the business of a butcher, excluding that business from the contested class on the following basis: "* * * He (a butcher) still has the unquestioned right to fix his prices; he still has the unquestioned right to say that he will or will not contract with any member of the public. What differentiates all such activities from a true public utility is this, and this only: That the devotion to public use must be of such character that the public generally, or that part of it which has been served and which has accepted the service, has the right to demand that that service shall be conducted, so long as it is continued, with reasonable efficiency under reasonable charges. Public use, then, means the use by the public and by every individual member of it, as a legal right. Such is not only the accepted significance of the phrase by the great weight of authority as expounded by Mr. Lewis (Eminent Domain, sec. 164 et seq.), but is the definition repeatedly announced by this court. * * *"
In Terminal Taxicab Co. v. Kutz et al., Public Utilities Comm. of District of Columbia,[33] the Supreme Court refused to consider garage call service in connection with taxicabs as a public utility, stating: "* * * But, however it may have been in earlier days as to the common callings, it is assumed in our time that an invitation *215 to the public to buy does not necessarily entail an obligation to sell. It is assumed that an ordinary shopkeeper may refuse his wares arbitrarily to a customer whom he dislikes, and although that consideration is not conclusive * * * it is assumed that such a calling is not public as the word is used."
The Restatement of Torts adopts this classification:
"Sec. 191. Comment:
"a. What constitutes a public utility. What amounts to such a holding out to the public as to make an enterprise a public utility is beyond the scope of the Restatement of this Subject. The phrase public utility is used in the Restatement of this Subject to describe a person, corporation or other association carrying on an enterprise for the accommodation of the public, the members of which as such are entitled as of right to use its facilities. Usual instances of a public utility are common carriers, common innkeepers, telegraph and telephone companies and gas and electric companies. (Italics supplied)
"b. A patron of a public utility is one who is exercising his right as a member of the public to make use of services of a public utility. * * *"
The obligation to the public is restated in virtually every decision dealing with the subject matter. Unquestionably Congress was informed as to this criterion. Generally speaking, its members are as familiar with general substantive legal principles as are the courts  often they are better informed as to basic economic and business concepts. This imputation is more than a presumption. An excellant illustration of what Congress intends in its use and understanding of the term "public utility" is illustrated by a passage from the Foreign Trade Zones Act of 1934:[34]
"Operation of zone as public utility; cost of customs service. Each zone shall be operated as a public utility, and all rates and charges for all services or privileges within the zone shall be fair and reasonable, and the grantee shall afford to all who may apply for the use of the zone and its facilities and appurtenances uniform treatment under like conditions * * *."
I conclude, then, that a public utility is uniformly understood, aside from a particular statutory classification, to be, at least, a business affected with a public interest, closely associated with transportation or distribution, and under an obligation to afford its services to the public generally at reasonable and non-discriminatory rates. At this stage of the discussion, therefore, we are, in our quest for the concept in question, at these relative positions: We have removed public utilities at least two steps from the broader category of "business affected with a public interest," and at least three steps from the still broader category of "business in general."

IV. Franchise and Monopoly.
In the distinguished array of decisions wherein the concept has been defined, it has uniformly been considered one of the fundamental characteristics of a public utility that it be a business so constituted as to enjoy comparative freedom from commercial competition. This status is attained in two ways: (1) A business may practically succeed in eliminating its competitors, squeezing them out of the field or reducing their activities below the level of serious competition. Sometimes by preempting the field and by the exertion of economic pressure, a business may preclude the emergence of a serious competitor. (2) The state, itself, may place an enterprise in this status. The legislature may feel that the economic interests of the general public will be better served by curtailing the right to enter a particular calling, that the conduct of a particular activity is so packed with social and economic ramifications as to require its operations to be limited to a small or controlled number of companies. The State, therefore, exercises its power to exclude or prohibit unconditionally the establishment of such an enterprise.[35] The discretionary grant of a franchise or certificate of public convenience and necessity, is the device by which the State effects this policy. Then exists a monopoly or quasi-monopoly, which is state-created and state-sanctioned. But the State may be very generous with its grant of privileges. It may grant concurrent franchises, depending upon the nature of the business and the public interest to be served, to two or even more businesses. Exclusiveness is clearly not an essential feature of a franchise;[36] in fact, *216 there are presumptions against the creation of an absolutely monopolistic status.[37] This control by franchise is to be distinguished, however, from the lesser right of the state, generally, to condition the establishment or continuance of a business upon the maintenance of certain sanitary, safety, or similar supervisory standards, or upon the maintenance of maximum seller's prices.
The Price Administrator has submitted a definition of the concept public utility, as he believes the term should be interpreted, which recognizes the franchise or monopoly characteristic. On page 31 of his brief he says: "* * * at the time Congress enacted the Emergency Price Control Act the term "public utility" had a general significance with respect to a particular group of businesses. If those businesses have a common characteristic, it is that their importance to the economic life of the community has been generally recognized as being so great as to warrant the community in according them monopoly status [which he admits is customarily accorded by a certificate of convenience and necessity] in exchange for the obligation to provide continuing service to all at reasonable rates. * * *"
Aside from the Price Administrator's agreement that this attribute is part of the public utility parcel, there is an imposing amount of case authority in support.
In Frost v. Corporation Commission,[38] the Supreme Court listed a few familiar instances of businesses which are generally treated as public utilities. It did not include public warehouses, but it went on to say that those enumerated were merely "illustrations of a more comprehensive list" concerning which it stated: "* * * it is difficult, upon any conceivable ground, to exclude a cotton gin, declared by statute to be a public utility engaged in a public business, the operation of which is precluded without a permit from a state governmental agency, and which is subject to the same authority as that exercised over transportation and transmission companies in respect of rates, charges and regulations. Under these conditions, to engage in the business is not a matter of common right, but a privilege, the exercise of which, except in virtue of a public grant, would be in derogation of the state's power. Such a privilege, by every legitimate test, is a franchise." (Italics supplied.)
In Southern Ohio Power Co. v. Public Utilities Comm.,[39] the Ohio Court, in denying an electric company public utility status, said: "The Southern Ohio Power Company claims * * * that it has not at any time received any public franchise; and that it has never held itself out to the public as willing to serve the public generally; and that it never intended to nor did it in fact dedicate its property to public utility service * * *."
In his dissent in New State Ice Co. v. Liebmann,[40] Justice Brandeis said flatly: "If the business is, or can be made, a public utility, it must be possible to make the issue of a certificate a prerequisite to engaging in it." (Italics supplied)
The majority in the New State Ice Co. case in effect denied public utility status to an ice producing plant, declared by Oklahoma statute to be a public utility subject to license or permit from the Corporation Counsel of Oklahoma. The Court made it plain that it was the license or franchise feature of the Oklahoma law as applied to ice companies to which it objected. It did not feel that an ice company could be constitutionally subjected to such control because such an enterprise was "not the case of a natural monopoly, or of an enterprise in its nature dependent upon the grant of public privileges." (Italics supplied) In the Nebbia case,[41] the Court excluded the milk industry from the public utility concept upon exactly the same basis, that is to say, that there was not present "any monopoly or monopolistic practice. It goes without saying that those engaged in the business are in no way dependent upon public grants or franchises for the privilege of conducting their activities."
In another Federal decision, Publix *217 Cleaners v. Florida Dry Cleaning and Laundry Board,[42] involving the applicability of public utility regulation to a dry cleaning business, the public utility formula was promulgated in precisely the same disjunctive terms, i.e., either that the business be a monopoly or that it be subject to a public grant or franchise.
"No one questions legislative authority, in the exercise of the police power, to fix prices for public utilities which render indispensible services, and enjoy in their business a monopoly or public grants or franchises, and which must serve all alike upon demand. The dry cleaning business is not a `public utility' in that sense." (Italics supplied)
Besides being implicit in the duty to serve the public at fair and non-discriminatory rates, the right of the State to regulate, prescribe rates, and subject other operations of a public utility to varying supervisions is, although it is often not exercised, included within the greater right to exclude or to license. However, generally, all businesses affected with a public interest are subjected or are properly liable to subjection to some or all of these controls. The nature of the business, together with the economic evils peculiar thereto, are what determine the limits to which the State can go in this respect without contravening the rights involved in due process of law. The extent and variation of the innumerable controls imposed upon public utilities, however, is not germane to this determination. Judicial notice may be taken, however, of the fact that in many States there is an absence of various controls over certain public utilities. Delaware, for example, exercises no rate control whatever. This, however, and other instances of non-regulation, is a matter of local policy, and does not represent a want of power.

V. Definitive Summary.
I come out, therefore, in my partial promulgation of a public utility definition, with a composite formula, pieced together from an analysis of the judicial treatment in a fairly exhaustive review of the decisions. The quotations set forth herein reflect a unanimity of impression and understanding in both Federal and State judicial circles as to the considerations involved in the public utility concept. The definition was not stated in these opinions as upholding a classification made by statute, but as the lay and professional understanding and recognition of the term and what it involved.
This, then, is my exact position: If a business is (1) affected with a public interest, and (2) bears an intimate connection with the processes of transportation and distribution, and (3) is under an obligation to afford its facilities to the public generally, upon demand, at fair and nondiscriminatory rates, and (4) enjoys, in a large measure an independence and freedom from business competition brought about either (a) by its acquirement of a monopolistic status, or (b) by the grant of a franchise or certificate from the State placing it in this position, it is for the purposes of the Price Control Act, as amended, a public utility, and subject to the exemption provisions of Section 302(c).
It is these four attributes which make up the bundle or the public utility formula to the extent which I have promulgated it. The formula is a limited one. It is designed only to provide an absolute test or standard by which one may affirmatively determine that a particular business is a public utility. I do not wish to be misunderstood as indicating that a business possessed of or operating under less than the total of these features may not be considered a public utility. My formula has no negative or exclusive implications. What I do say is that, at least, any business which does possess and practice and operate under each and all of these features, is by a preponderance of considered judicial opinion a business in the public utility class. I feel that this supplies the natural significance and customary connotation which must be our guide in this controversy. Now, having cut the cloth of the contested concept, let us proceed to examine the attributes of the complainant's public warehouse and then determine whether or not it will fit the pattern.

VI. The Statutory Regulation of the Complainant's Public Warehouse.
The Constitution of California designates warehouses in which there is a public use to be public utilities and vests in the Legislature the authority to regulate all public utilities within the State.[43] Pursuant to these powers, the Legislature, in 1911, enacted *218 the Public Utilities Act,[44] conferring the authorized power upon the Railroad Commission. The Act of 1911, however, did not include every warehouse within the definition of the terms "public utility", or within the regulations and controls set forth. Only those warehouses which serve the public generally, or any portion thereof, for compensation, were made public utilities and held to be subject to the controls stated. The term warehouse, as used in the Act, was expressly limited to "* * * any building or structure in which property is regularly stored for compensation within this state, in connection with or to facilitate the transportation of property by a common carrier or vessel, or the loading or unloading of the same * * *.[45] (Italics supplied)
This was supplemented in 1927 with "* * * any building, or structure, or warehouse, in which merchandise, other than second-hand household goods or effects, and other than merchandise sold but retained in the custody of the vendor, is regularly stored for the public generally, for compensation, within this state, excepting warehouses conducted by any nonprofit, cooperative association or corporation which is engaged in the handling or marketing of the agricultural products of its members * * *."[46]
The California Act requires that such a public warehouse grant non-discriminatory and equal rates to everyone, giving the Railroad Commission the power to determine any question of fact relevant thereto.[47] The right to establish or operate a public warehouse of complainant's class is made subject to the complete authority of the Railroad Commission; a franchise in the nature of a certificate of public convenience and necessity is required to begin the operation of this business or to entend or expand existing facilities; and, the grant of this franchise may be refused by the Railroad Commission with or without a hearing, and, if granted, the Commission may attach to the right to engage in the business such terms and conditions as it deems the public convenience and necessity may require, or it may, at any time and for good cause, suspend, revoke, alter, or amend this right.[48]
In addition, the complainant is forbidden by the Act to alter any existing rate or charge without proper application to the Railroad Commission.[49] The Commission is empowered, either upon its own motion or upon complaint, to find that the warehouse rates are "unjust, unreasonable, discriminatory or preferential." It may then determine the "just, reasonable or sufficient" rate, and fix the same by order.[50] The Commission may also, upon its own motion or upon complaint, investigate a single charge, rate or rental of complainant's, or any schedule of its warehouse rates, and establish new prices, rentals, or charges in lieu thereof.[51]
Periodical reports are required to be furnished the Commission,[52] and there is other general supervision.[53] The Commission has the duty of investigating all accidents occurring on complainant's premises.[54] It is empowered to institute safety regulations and to impose the use of certain appliances and equipment in complainant's storage operations.[55] Complainant is under serious restrictions as to merger or transfer of franchise, or the sale, lease, mortgaging, assignment, or incumbrance of its property, or any part thereof.[56] It cannot acquire any part of the capital stock of any other public utility,[57] and it must account to the Commission for the disposition of the proceeds of all sales of stocks.[58] And there are countless other regulations and restrictions, the non-observance of which place complainant subject to serious fines and penalties.[59]

VII. The Attributes of the Formula are present in the Complainant's Business.
With cognizance of the complainant's statutory position, we proceed to determine whether the combination of attributes contained in our formula are present in its business.
(1) Business affected with a public interest.
*219 Clearly, complainant's business is one affected with a public interest. Munn v. Illinois[60] determined this as to public warehouses. Nor can the absence of the term "public utility" in that decision in any wise be considered as an implied negation of the appropriateness of public utility controls over public warehouses. The term public utility was apparently not in vogue in that day, although its verbal constituents had been paired for other denotations[61] prior to the Munn case. There is evidence, however, in more recent Supreme Court decisions, that that Court has considered public warehouses to be in the public utility category. The Munn case has frequently been the only citation offered in support of a proposition of law relating to public utility regulation.[62]
(2) Relation to transportation and distribution.
It is not difficult to establish the intimate association between complainant's activities and the processes of transportation and distribution. The California Public Utility Act does not purport to deal with any but public warehouses, and it specifically excludes those public warehouses engaged in rendering services to second-hand household goods or effects, selling merchandise which is retained in the custody of the vendor, or handling the produce of agricultural cooperatives. This excludes a wide area of public warehouse activity. It reduces the types of public warehouses regulated, as I see it, to those whose activities bear an intimate relation to the processes of transportation and distribution. In Section 2(aa), the only portion of the Public Utility Act containing a specifically affirmative statement relating to types of public warehouses included, the regulations are limited to those wherein "property is regularly stored for compensation * * * in connection with or to facilitate the transportation of property by a common carrier * * *." (Italics supplied)
In its oral argument before us, complainant has urged that a public warehouse could not function properly without railroad facilities, that the very nature of the business required that it be so located as to receive prompt delivery by rail and so located in relation to the distribution area that it can give prompt delivery. Except insofar as it reflects a reciprocal reliance, however, our primary interest is not how dependent a public warehouse is upon railroad facilities, but rather how reliant are railroads and the general flow of commerce upon public warehouses.
Public warehouses, of the character involved in the present controversy, are in the very "throat" of commercial activity. Although they do not actually transport goods, they render an indispensible service "before the journey begins, when it ends, or along the way."[63] This intimate connection with the processes of transportation and distribution was the very reason that public warehouses were held to be devoted to a public use in the great case of Munn v. Illinois. There the Court, after describing the essential role of the particular public warehouse in the movements of grain in interstate commerce, stated:
"The railways have found it impractical to own such elevators, and public policy forbids the transaction of such business by the carrier; the ownership has, therefore, been by private individuals. * * * Under such circumstances it is difficult to see why, if the common carrier, or the miller, or the ferryman, or the innkeeper, or the wharfinger, * * * [etc.] pursues a public employment and exercises `a sort of public office' these plaintiffs in error do not. They stand, * * * in the very `gateway of commerce,' and take toll from all who pass. Their business most certainly `tends to a common charge, and is become a thing of public interest and use.' Every bushel of grain for its passage `pays a toll, which is a common charge,' and therefore, according to Lord Hale, every such warehouseman `ought to be under public regulation * * *.' Certainly, if any business can be clothed `with a public interest, and cease to be juris privati only,' this has been. It may not be made so by *220 the operation of the Constitution of Illinois or this statute, but it is by the facts."[64] (Italics supplied)
In Budd v. New York,[65] the Supreme Court stated: "* * * the business of elevating grain is a business charged with a public interest, and those who carry it on occupy a relation to the community analogous to that of common carriers. The elevator owner, in fact, retains the grain in his custody for an appreciable period of time, because he receives it into his custody, weighs it, and then discharges it, and his employment is thus analogous to that of a warehouseman." (Italics supplied)
It seems, therefore, that a public warehouseman of the class involved holds himself out to serve the same general public as the railroad. The Price Administrator himself seems to have recognized this. In Amendment 1 to Supplementary Regulation No. 11[66] exempting certain commodities from price regulation, the Price Administrator included:
"(68) Transportation of commodities by persons offering their services to the general public as common carriers by rail, water, motor, pipe line, or other means of conveyances, rates charged for: Provided however, That charges for storage and warehousing and all other services incident thereto by any person shall not be excluded from the General Maximum Price Regulation."
At its least, this regulation reveals that the Price Administrator considered the services of certain warehouses to be so intimately associated with common carrier facilities as to consider and deal with the two together in enumerating a very extended list of commodities. Of greater relevancy, however, is the apparent fact that he expressly excluded warehouse services from an exemption relating to common carrier prices, lest the former, by natural implication, be considered to have been included with the latter. Needless to say, however, this effort of the Price Administrator cannot alter the natural significance of terms and meanings as employed by Congress.
Finally, I call attention to what I believe is an accurate equation in transportational proportion. Surely the vital position which the wharf occupies as regards water-borne commerce must be analogously accorded to the warehouse as regards railroad commerce. In this nation the quantity of railroad freight tonnage is many times that of water-borne commerce, and the public warehouse must be considered to have equalled if not surpassed the wharf in commercial importance. I think that it must be accorded a position commensurate with that achievement.
(3) Equal and reasonable service to the public upon demand.
In conformity with its statutory requirements, the complainant makes its storage facilities available to all who demand them at fair and equal rentals. The complete supervision and control over all aspects of this phase of the complainant's business has been described.
(4) The franchise feature.
Warehouses of complainant's class have been branded public utilities by the statutes of California, under proper constitutional authority. They have the imprimatur of the state. But more than a brand or label has been stamped. Warehouses of the complainant's class are dependent upon the grant of a certificate of public convenience and necessity. Moreover, the exercise of the right to engage in the business is subject to alteration, suspension, or revocation by the state, whose regulatory powers in this regard have been made very broad.
Both in statutory position and in actual operation we find the complainant's public warehouse to be clothed with each of the attributes comprising the public utility bundle, as set out in the limited formula promulgated.
In addition to possessing all the attributes in the four-pointed formula, however, complainant's rates are actually fixed by the Railroad Commission of California. Actual rate-fixing by the state, as distinquished from its unexercised right to fix rates, is a common, but by no means universal regulatory feature of a public utility. It is not one of the fundamental determinative attributes found to be present almost without exception in the public utility bundle, but it is a frequent form of regulation or supervision applied to a public utility. There are other common regulatory features which are in this category (and *221 which complainant possesses), such as an obligation to continue service, limitations upon stock transfers, restrictions upon the sale, leasing, transferring, or incumbrance of property, et al.
The actual fixing of rates by existing federal, state, and municipal agencies, however, was apparently relied upon heavily by Congress as a feature about public utilities generally which entitled them to be excluded from the supervision of the Price Administrator. Complainant has made much of this point, urging in particular that only those public utilities which were under the jurisdiction of existing rate regulatory bodies were intended by Congress to be included within the exemption.
The Congressional consideration of the Bill furnishes conflicting indications upon this score. Testifying before the House Banking and Currency Committee, Mr. Leon Henderson, later the first Price Administrator, made statements at several points regarding the exemption of public utilities:
"(1) * * * and public utilities were under what for the time being at least seemed to be an adequate system of State regulation, and therefore did not need to be brought into review. * * *[67]
"(2) * * * Now, as to utilities. There is, as the members are aware, an adequate set of regulations as to the charges which utility companies can make. These, again, are based upon a long series of judicial determinations, of State regulations, and of State laws. It seemed to those drafting the bill that this was an area which was not likely to give difficulty or to cause, so far as they could see at that time, any inflationary trend. The bill is designed to control an emergency inflationary situation and has left them out, just as it has transportation rates. There are questions peculiar to utilities and none of them, so far as I see at the present time, would make necessary further regulation by means of a price-control bill.[68]
"(3) * * * I have found that everyone of the agencies charged with these particular items of cost (agencies of government in charge of public utility rates) are just as earnest as we are about keeping those costs down.[69]
"(4) Mr. Patman * * * I understood * * * that you were satisfied with the rate-making bodies in the States, and that that was the reason you did not ask that utility and transportation rates be included. Do I understand that correctly?
"Mr. Henderson: I did not mean to limit it to existing regulatory mechanisms both in transportation and utilities. What I said was that the transportation rates themselves were already under regulation by Federal and State agencies, and I also feel that this is not an item, even in the absence of that regulation, to be brought under commodity price regulation.[70]"
Congressman Steagall, Chairman of the House Banking and Currency Committee and the sponsor of the bill on the floor of the House, made the following statement: "The bill also provides explicitly in Section 302(c) that nothing in the act is to be construed to authorize * * * the regulation of rates charged by any common carrier, or other public utility, which are usually subject to adequate control by State or other Federal agencies.[71]"(Italics supplied)
The Amendments to the Price Control Act of October 2, 1942,[72] and the legislative discussion pertinent thereto lend some support to the complainant's position. Senator Norris had urged an amendment which would have placed limitations upon increases in public utility rates above the September 15, 1942 level.[73] From the Senate floor, he described the effect of the then existing law as follows: "In the act creating the Office of Price Administration we specifically excluded from his control all regulation of public utility rates, such as telephone, gas, water, and electric rates, street car fares, and so forth. It was natural that such an exclusion should be made because the regulation of all such rates is provided for and controlled by *222 various boards and commissions.[74]" (Italics supplied)
The Norris amendment was rejected in conference. The conference report, however, contained certain language, referred to by Senator Brown as a substitute for the Norris proposal,[75] which reads as follows: "Provided, That no common carrier or other public utility shall make any general increase in its rates or charges which were in effect on September 15, 1942, unless it first gives thirty days notice to the President, or such agencies as he may designate, and consents to the timely intervention by such agency before the Federal, State or municipal authority having jurisdiction to consider such increase.[76]"
From the testimony before the Committee and the amendment agreed upon in conference, it is clear that Congress was giving substantial consideration to the existence of rate controlling agencies for public utility enterprises. Perhaps this was the moving consideration for their exemption. Certainly complainant's is a logical position to advance, in view of this testimony, and in view of the purposes of the Price Control Act. Because the complainant's rates are in fact subject to complete controls by the Railroad Commission of California, however, I do not feel that it is proper or necessary for us, in the circumstances, to make a gratuitous determination as to whether existing rate control by some governmental body was made the pivotal factor in the exemption of a particular public utility. Since complainant, therefore, besides bearing all the burdens of the "bundle" of which I have spoken, has its rates fixed by an existing regulatory commission, it is not only a public utility within the virtually universal significance of the term, but it is a public utility which is operated and controlled in the manner which, it appears, may have influenced Congress to exempt the class, "public utilities" in general.

VIII. Sundry contentions and arguments of the parties.
The complainant has argued that Congress intended that the term public utility be construed as applied by federal, state, or local regulation. It feels that all businesses designated as a public utility by a particular law were intended to be exempted by Congress in its use of the term. The concept, public utility, is, however, more than a label. I have previously denominated it as a bundle of characteristics, enumerating the principle structural components. The state legislatures have been too generous with the use of the term to allow the assumption that Congress intended the complainant's superficial standard to govern. The use of the term by some of the states has, as Judge Maris has said, been so far broadened that in one of them, to cite an extreme case, it is defined to include "every corporation, or person now or hereafter declared by law to be affected with a public interest * * *."[77]
I feel that Congress intended greater uniformity and more extensive control by the Price Administrator than to allow a name or a label, as applied by another governmental body, to thwart its anti-inflationary efforts. There are far firmer standards to adopt, and we cannot stop at the skin of a legislative designation of a business as a "public utility." We are obliged to indulge in some subcutaneous delving. It is characteristics and not names that control. For instance, the question: "Is a storage house or a warehouse a public utility?" is as insusceptible of an answer as is the question: "Is a vehicle which transports human beings a common carrier?" When the latter is posed, questions are asked, characteristics and attributes are sought. So it must be in the consideration of a public warehouse as a public utility.
The Price Administrator for his part has contended that a warehouse is a warehouse, and that if we hold complainant's business exempt, all public warehouses in all states would be exempt, however limited the controls they are under, because it cannot be considered the Congressional intent to exempt a certain kind of business in one state, and to include the same business in another state depending upon the existence and scope of local regulation. He argues that there must be uniformity throughout the states in the application of the Price Act.
Again  the fault in this argument lies in failing to treat public utility as a bundle of attributes. Businesses are not "the same" *223 merely because they turn out the same product or handle the same commodity or facility. It is a false uniformity, indeed, that would be founded by looking only at the end product. It is far more than what a business offers for sale which determines its status as a public utility. The Price Administrator has criticized the complainant's contention that the state label should apply as promoting non-uniformity and irregularity, but the substitute scale which he submits seeks a similarly superficial standard. I am not forcing all warehouses into a single category. The realistic, analytic appraisal afforded by the formula I provide assures that an equitable and reasonable standard will be applied in the consideration of any particular warehouse. The nature of the business, how it is operated, and how it is regulated, rather than what it is labeled and what product it sells will be determinative. I am cognizant that there must be uniformity throughout the states in the application of a Federal law; this is a familiar principle of Federal statutory construction.[78] I believe, however, that uniformity cannot be achieved but by considering attributes, controls, obligations, and method of operation.
The Price Administrator did not apply his so-called "uniformity" rule in issuing regulations under the Price Act. Therein public utilities are exempted from regulation. In Supplementary Regulation No. 11, Amendment No. 1, however, in exempting certain enterprises from price regulation, the Price Administrator included gas, electric, water, et al., companies furnishing or supplying "as public utilities." (Italics supplied) Clearly, however, if all companies producing gas, electricity, and water were public utilities, the quoted appendage to the exemption is superfluous. It is a well-known fact that there are many companies furnishing these facilities which are not public utilities,[79] and any attempt to treat them as such would be in derogation of due process.[80] Some of them are public utilities, and some of them are not, all depending upon how they are organized and operated. One will be burdened with the essential characteristics of which I have spoken. Another will not be. One will be subject to the controls of the Price Administrator, the other will not be subject. So it is, and must be, with public warehouses.
The New Hampshire decision of State v. Frost,[81] is illustrative of the disposition of the courts, in considering whether a particular business is a public utility, to regard not the commodity involved, but the extent of the obligations to the public and the manner of service required. The case is of especial value because it deals with public warehouses. A New Hampshire statute defined a public warehouseman to be anyone "who keeps and maintains a warehouse for the storage of goods, wares and merchandise." Laws 1937, c. 90. Referring to this statute, the Court said:
"The recital that such a person shall be a `public' warehouseman seems a superfluous and meaningless designation. It is not intended that the business shall be a public utility with obligation to serve all who come for reasonable charges and without discrimination. Regulation is limited to that specifically prescribed [provisions for the negotiability of warehouse receipts], and there would be no lessened regulation if the designation were omitted."[82]
The Price Administrator has also urged that Congress could not have intended to include warehouses in the exemption clause as a public utility because the majority of states have not denominated them as such. He submits statistics which show that only *224 three states[83] have included all types of public warehouses in the statutory definition of public utility, and that in only eight other states[84] have particular types of warehouses been so designated. I have already indicated that we should be unimpressed with mere labels. The imprimatur of the state is worthy of passing notice, it may serve as a starting point for inquiry, but it hardly touches the more pertinent problems involved. On the other hand, respondent's statistics are germane and informing, insofar as they reveal the extent to which the eleven states concerned regulate their so-called public utility warehouses. Respondent says each warehouse designated as a public utility is under an obligation to serve the public at large without discrimination. All are dependent upon state permission to engage in the business. In six instances a certificate of public convenience and necessity is required;[85] in the remaining five, licenses must be secured.[86] In the eight states which designate only particular types of warehouses "public utilities", a division is made upon the basis of warehouses used in connection with a common carrier[87] or warehouses storing important agricultural commodities[88] which enjoy a nation-wide market. Furthermore, in each of the 48 states public warehouses are subject to some regulatory agency, and in sixteen states that agency is a Public Utility Commission.
Although, as I have said, I do not feel it necessary that a warehouse or any other business enterprise be possessed of all of these attributes in order to be considered a public utility, it is nevertheless instructive to note that the eleven states, which have so denominated public warehouses, appear, almost without exception, to have imposed all of the attributes which are included within the four-pointed formula. If the other thirty-seven states have not as yet seen fit to impose, in substantial measure, corresponding duties and regulations upon their public warehouses, then, I feel, it is perhaps proper that the latter have not been designated public utilities in those states.
Respondent, however, points out that in only three states[89] are all types of warehouse rates determined by a rate-fixing agency, and that in only twenty-four additional states[90] are some types of warehouses so regulated. He contrasts this with the high majority of states determining the rates and charges of gas, water, electricity, telephone and telegraph companies, etc. He concludes that a public warehouse simply isn't one of the familiar, traditional enterprises that is considered and treated as a public utility, and that, therefore, Congress could not have had it in mind in exempting that class of enterprise from price control.
Complainant has countered with other statistics indicating that four states fix the rates of all types of warehouses,[91] that five states fix the rates of warehouses used in connection with common carriers[92] or railroads,[93] and that twelve other states fix the rates of warehouse storing important agricultural products.[94]
It is not necessary to iron out the inconsistencies between these conflicting sets of statistics. Rate fixing by the state is not an acceptable criterion for determining whether or not a business is a public utility. I have hereinbefore stated that, although Congress may have intended to make it the pivotal factor as to whether or not a particular public utility should be exempted *225 under Section 302(c), I do not consider that actual imposition of rate control is necessary to constitute a business a public utility. Because the majority of states have not, as of this date, considered it advisable to fix pubic warehouse rates does not mean that, when they feel the public interest demands it, they will fail to impose appropriate regulations. Failure to act or to exercise a power is not to be confused with want of power. Although considerations of policy may stay its hand, the power of the state to control the rates of a public utility is clear. The submitted statistics, therefore, do not solve our problem. A counting of noses as to the states regulating the rates of a particular business is not the proper test, and certainly not a conclusive test.
Admittedly, some businesses, such as public gas and electric companies, are regulated as public utilities more prevalently than other kinds of enterprises, and, of course, it is a matter of more general information that these businesses are so controlled. The extent to which a business has been subjected to public utility regulation, however, or the general knowledge as to that control, clearly does not affect the question.
My brothers who stand for affirmance have said that we must take the term "public utility" in its "natural and ordinary meaning." They also appear to agree with the conclusions which I have reached as to that natural and ordinary meaning. They seek, however, to deny the appropriateness of that meaning in the case at bar, saying that in this particular act Congress employed a meaning which is narrower than the usual usage. They urge that the term was used in the Price Act to include only those familiar and traditional public utilities  "garden variety" stock, as Judge Magruder says. But those who assert a special meaning are charged with its proof. In the absence of a definite showing of the limited meaning, the natural and ordinary connotation must prevail. Any limitation must be deducible as a clear and ready inference from the Congressional language. I have looked in vain for such language.
It is true that the courts have given weight to an intervening administrative interpretation which has been the subject of considerable practice and tacit approbation. I do not feel, however, that it may be fairly said that the regulation, upon which the majority relies, imputes notice to Congress. The statement that warehouses and storage are to be considered subject to the General Maximum Price Regulation serves no indication that the Price Administrator did not consider such regulation subordinate to the provision of the Price Act exempting "public utilities" from regulation, and that he did not intend to exempt those warehouses which were so treated. The reliance upon such an interpretation begs the question which we are here called upon to decide, as I see it. At any rate, it can hardly be expected that Congress, as a whole, would be acquainted with the prodigal detail of the Price Administrator's orders and regulations, and particularly with an interpretation which was hidden in the recesses of a proviso to the 68th item of an order amending a supplementary regulation to an original order, which was of three and a half months' duration and had not been interpreted by this Court.
If Congress passed a law restricting the importation of all animals, would it be considered that the law was not applicable to a wou-wou because such is not generally known as an existing animal, and thus not an animal which Congress had in mind in passing the act? I feel that if Congress had intended, as the Price Administrator contends, to limit the exemption in question to a few of the more familiar businesses regulated as public utilities, it would have specifically enumerated those few intended. But the fact that the great majority of the states may not have imposed an obligation upon all warehouses to operate as public utilities cannot affect the fact that in some states certain public warehouses have been so constituted.
Often an enterprise may be one peculiar to only a particular region of the nation, e. g., wheat elevators or cotton gins. By the Price Administrator's standard, however, these could not be considered public utilities because only a minority of the states may treat them as such. A few illustrations of the judicial treatment of a business after the imposition of public utility attributes thereupon, will serve to show this contention untenable.
In the Packers and Stockyards Act,[95] for example, it is provided that no one may "carry on the business of a market agency or dealer" at certain types of public stockyards *226 unless registered with the Secretary of Agriculture, under the rules and regulations which the latter prescribed.[96] The Act forbids certain unfair practices in the industry. Stockyards are required to maintain equal service for all at equal rates,[97] and these rates and charges are subjected to regulation and control by the Secretary.[98] The transactions subject to the Secretary's supervision are stated to be those in the customary "current of commerce" as regards meat products "sent from one State with the expectation that they will end their transit, after purchase, in another * * *."[99] In Stafford v. Wallace,[100] the Supreme Court attributed the following effect to this Act:
"The act * * * treats the various stockyards of the country as great national public utilities * * *. It assumes that they conduct a business affected by a public use of a national character and subject to national regulation."
This designation has been reaffirmed and the stockyards definitely termed public utilities in recent decisions.[101]
In Frost v. Corporation Commission,[102] the Supreme Court upheld an Oklahoma statute making certain types of cotton gins public utilities and requiring one entering the business to acquire a license or franchise from the state.[103] Neither stockyards nor cotton gins are considered familiar, "traditional" public utilities. They are not "garden variety" stock. When, however, those engaged in these businesses in a particular area had been compelled to run their activities in a certain way, had had certain obligations imposed upon them by the state, and had been required to render certain services to the public generally, the Supreme Court was not hesitant in conceding full membership in the public utility family to the particular businesses so treated.
A highway tunnel company is certainly not a familiar "traditional" public utility. It grows in very few gardens. In Parsons v. Detroit & Canada Tunnel Company,[104] however, the Federal court in holding such a company to be a public utility said:
"The defendant tunnel company is properly incorporated under the General Corporation Act of Michigan, so called, under which many other public utilities are required to be incorporated. Railroad companies and railroad tunnel companies (as distinguished from highway tunnel companies such as the defendant) are required to incorporate under special acts. There is no special Michigan law under which all public utilities are required to incorporate, and the Legislature has not defined public utilities. Under these circumstances, the fact that the defendant company is organized under the act governing the organization of general business corporations is no indication, as contended by the respondents, that the property and business of the company is not properly classified as a public utility. Section 3555 of Michigan Compiled Laws of 1929 requires the property of certain rail carriers and of telephone and telegraph companies to be assessed by the Michigan state tax commission and a specific tax paid thereon in lieu of other taxes. Highway tunnel companies and many other public utility companies are not included. This is no indication that the business and property of the defendant company is not properly classified as a public utility; there being nothing in the language of the statutes to indicate that a company cannot be considered a public utility unless it is included therein. The purpose and nature of its business and devotion of its property to the public use under the circumstances involved, and not the statute under which it is incorporated or described for purposes of taxation, determines whether or not it is a public utility. 51 C.J. 5." (Italics supplied)
Respondent has expressed a fear that such an interpretation will render the controls of the Price Administrator subject to being defeated because any enterprise may be put beyond his reach by being designated a public utility by the states. This *227 argument has no weight, however, for in addition to statutory designation there must be the public utility characteristics, and the states are clearly limited in their right to control a business as a public utility. The limitations of due process are always applicable.[105] The case of New State Ice Co. v. Liebmann,[106] illustrates the attitude of the courts in limiting the power of the states to create public utilities. The Supreme Court of California, itself, has recognized this limitation, announcing that the courts will not sustain the imposition of public utility control upon any enterprise which is not of the proper character.[107]
The respondent argues that the definition of "commodity" in Section 302(c) to include services rendered "in connection with the processing, distribution, storage, * * * of a commodity" (Italics supplied) expressly includes warehouses. But complainant has aptly pointed out that if this be so, railroads would also be included in the Price Administrator's control as they engage in the business of "distribution" of commodities. It is true that certain storage facilities are subject to the controls of the Price Administrator, but when a storage enterprise is conducted as a public utility, it falls within the provided exemption, which is dominant and controlling.
Allusion has been made to certain dictionary and encyclopaedic definitions wherein lists of public utilities have been formulated and in which warehouses have not been specifically included.[108] Other authoritative references have included warehouses,[109] but I think it will suffice to say, here, that those definitions wherein the term has been excluded either do not purport to be complete (often no more than three or four examples are listed), or, when the list is extended, the elementary construction rule of ejusdem generis is applicable.
Finally I might add that certain statements in the respondent's brief come close to committing him to an agreement that complainant's warehouse should be regarded as a public utility. Respondent admits that "certificates of public convenience and necessity are the customary device by which monopolistic status is accorded and protected." He further admits that monopolistic status together with the duty to serve the public upon demand at reasonable and non-discriminatory rates is the one common characteristic (if there be such) of a public utility. This is a substantial admission in view of the fact that respondent cannot, and indeed does not attempt to, deny that complainant operates under such a certificate and that it is under an obligation to serve the public in the manner described.

IX. Conclusion.
I feel that it has been demonstrated that complainant's public warehouse is a business which is (1) affected with a public interest, and (2) bears an intimate connection with the processes of transportation and distribution, and (3) is under an obligation to afford its facilities to the public generally, upon demand, at fair and nondiscriminatory rates, and (4) enjoys in a large measure an independence and freedom from economic competition brought about by the grant of a franchise from the state placing it in this position. In addition complainant has its rates fixed by an agency of the state, and it possesses many other customarily incidental features of public utilities.
Under these circumstances, complainant must be considered a public utility within the virtually universal significance of the term, and, thus, included within the meaning of the term as employed in the Price Act of 1942. Consequently it should be held that complainant is entitled to the exemption as provided in Section 302(c), and that the General Maximum Price Regulation, Supplementary Regulation No. 11, and Amendment No. 1 thereto be set aside insofar as they purport to affect the complainant's charges concerned.
NOTES
[1] Constitution of California, Art. IV, § 33, Art. XII, § 23.
[2] Public Utilities Act of California, Gen. Laws Art. 6386, §§ 2(aa), 2(dd), 2½, 14, 15, 63(a).
[3] 7 F.R. 3153.
[4] 7 F.R. 4738.
[5] 7 F.R. 4543.
[6] 7 F.R. 4738.
[7] Lyeth v. Hoey, 1938, 305 U.S. 188, 194, 59 S.Ct. 155, 83 L.Ed. 119, 119 A.L. R. 410. The rule has been quite recently reiterated by the Supreme Court, speaking through Justice Douglas, in Jerome v. United States, 1943, 318 U.S. 101, 63 S.Ct. 483, 485, 87 L.Ed. ___, as follows: "But we must generally assume, in the absence of a plain indication to the contrary, that Congress when it enacts a statute is not making the application of the federal act dependent on state law. That assumption is based on the fact that the application of federal legislation is nation wide (United States v. Pelzer, 312 U.S. 399, 402, 61 S.Ct. 659, 85 L.Ed. 913) and at times on the fact that the federal program would be impaired if state law were to control."
[8] Spokane & I. E. R. Co. v. United States, 1916, 241 U.S. 344, 350, 36 S.Ct. 668, 60 L.Ed. 1037.
[9] Among the businesses which have been designated by state statutes as public utilities and regulated as such are the following: abbatoirs  N.C.Code of 1939, § 2832; airports  Fla.Stat.1941, § 180.07, F.S.A. § 180.07; armories  N.C.Code of 1939, § 2832; auditoriums  N.C.Code of 1939, § 2832; cemeteries  N.C.Code of 1939, § 2832; collecting systems  Fla. Stat.1941, § 180.07, F.S.A. § 180.07; cotton gins  Okla.Stat. Title 17, § 41; creosoting and other paving works  Minn. Mason's Stat.1927 § 1786; disposal works  Fla.Stat.1941, § 180.07, F.S.A. § 180.07; distribution systems  Fla.Stat. 1941, § 180.07, F.S.A. § 180.07; docks (public) Ala.Code of 1940, Title 48, § 302; garbage and sewage disposal plants  N.C.Code of 1939, § 2832; golf courses  Fla.Stat.1941, § 180.07, F.S.A. § 180.07; hospitals  Fla.Stat.1941, § 180.07, F.S.A. § 180.07; ice plants  Minn.Mason's Stat. 1927, § 1786; intakes  Fla.Stat. 1941, § 180.07, F.S.A. § 180.07; jails  Fla.Stat. 1941, § 180.07, F.S.A. § 180.07; libraries  N.C.Code of 1939, § 2832; market houses  N.C.Code of 1939, § 2832; markets (public) Minn.Mason's Stat.1927, § 1786; parks  N.C.Code of 1939 § 2832; play or recreation grounds  N.C.Code of 1939, § 2832; pipe lines  Fla.Stat.1941, § 180.07, F.S.A. § 180.07; pumping station  Fla.Stat.1941, § 180.07, F.S.A. § 180.07; purification works  Fla.Stat.1941, § 180.07, F.S.A. § 180.07; reservoirs  Fla.Stat. 1941, § 180.07, F.S.A. § 180.07; schools  N.C.Code of 1939, § 2832; sewerage  Fla. (sewerage systems and intercepting sewers), Stat.1941, § 180.07, F.S.A. § 180.07,  Minn. (sewer systems) Mason's Stat.1927, § 1786,  N.C. (sewer systems) Code of 1939, § 2832; slaughtering establishments  Minn.Mason's Stat.1927, § 1786,  N.C. (slaughter houses) Code of 1939, § 2832; stone quarries and crushing works  Minn.Mason's Stat.1927 § 1786; toll bridge or road  Ala.Code of 1940, Title 48, § 302(8); terminal (public)  Ala.Code of 1940, Title 48, § 302 (7); wharves  Ala. (public wharves) Code of 1940, Title 48, § 302(7)  N.C. Code of 1939, § 2832; wells  Fla.Stat. 1941, § 180.07, F.S.A. § 180.07.
[10] The acceptance of this view would in effect make of the Price Administrator a public utility commission for the State of Delaware in which state there is now no state regulation of the rates of common carriers or other public utilities.
[11] Cf. Keifer & Keifer v. R. F. C., 1939, 306 U.S. 381, 395, 59 S.Ct. 516, 83 L.Ed. 784.
[12] Colorado, Stat.Ann. (1935), Ch. 137 § 3.
[13] Excerpts from transcript of hearings before the Committee on Banking and Currency of the House of Representatives held on August 6 and 15, 1941, pp. 54, 55, 626, on H.R.5479 (superseded by H.R.5990) 77th Cong. 1st. Sess.
[14] Congressional Record, Vol. 87, p. 9308.
[15] Allnutt v. Inglis, 1810, 12 East. 527, 104 Eng.Reprint 206. For an illuminating discussion of this common law duty see McCurdy, The Power of a Public Utility to fix its Rates and Charges in the absence of Regulatory Legislation, 38 Harv.L.Rev. 202 (1924), especially pp. 206, 207 and note 12, in which the cases are collected.
[16] City of Madison v. Madison Gas & Electric Co., 1906, 129 Wis. 249, 108 N. W. 65, 8 L.R.A.,N.S., 529, 116 Am.St. Rep. 944, 9 Ann.Cas. 819, and cases therein cited.
[17] "The President may, except as otherwise provided in this Act, thereafter provide for making adjustments with respect to prices, wages, and salaries, to the extent that he finds necessary to aid in the effective prosecution of the war or to correct gross inequities: Provided, That no common carrier or other public utility shall make any general increase in its rates or charges which were in effect on September 15, 1942, unless it first gives thirty days notice to the President, or such agency as he may designate, and consents to the timely intervention by such agency before the Federal, State, or municipal authority having jurisdiction to consider such increase."
[18] See Statements of Senator Norris, Cong.Record, Vol. 88, pp. 7343-7346 and of Senator Brown, Cong.Record, Vol. 88, pp. 7970, 7971.
[19] See Goddard, The Evolution and Devolution of Public Utility Law, 32 Mich.L.Rev. 577, 578 (1934).
[20] Hawthorn v. Hammond, 1844, 1 C. & K. 404; Rex v. Ivens, 1835, 7 Car. & P. 213; Gordon v. Silber, 1890, 25 Q.B.D. 491; 28 Am.Jur., Innkeepers, § 46; 32 C.J., Innkeepers § 28.
[21] Wyman, Public Service Corporations §§ 6-16, incl.
[22] Ozawa v. United States, 1922, 260 U. S. 178, 194, 43 S.Ct. 65, 67 L.Ed. 199.
[23] Cf. Eagan v. Commissioner of Internal Revenue, 5 Cir., 1930, 43 F.2d 881, 883, 71 A.L.R. 863.
[24] Cf. Moody's Manual of Public Utilities (1942 Ed.) p. a3.
[25] California  Gen.Laws (Deering, 1937), Act 6386, § 2(dd); Indiana  Stat. Ann. (1933, Burns), §§ 67-501, 67-201, 67-202; South Dakota  Code (1939), § 52.0201.
[26] Idaho  Code Ann. (1932), §§ 59-128, 59-129; Illinois  Stat.Ann. (Jones), §§ 141.010(1), 141.011, Smith-Hurd Stats. Ill. c. 111 2/3, § 119; c. 114, § 189; Maine  Rev.Stat. (1930) Ch. 62, § 15, p. 1031; Nevada  Comp.Laws (1929), § 6106; North Dakota  Comp.Laws (Supp.1913-1925), § 4609c2; Utah  Rev.Stat. (1933), § 76  2  1; Washington  Rev.Stat.Ann. (Rem.), § 10344.
[27] Cf. Moody's Manual of Industrials (1942 Ed.) pp. a83, a91.
[28] See the discussion of this question by McAllister, Lord Hale and Business Affected with a Public Interest, 43 Harv. L.Rev. 759 (1930) and by Hamilton, Affectation With Public Interest, 39 Yale L.J. 1089 (1930).
[29] Nebbia v. New York, 1934, 291 U.S. 502, 533, 54 S.Ct. 505, 514, 78 L.Ed. 940, 89 A.L.R. 1469.
[1] January 30, 1942, c. 26. Sec. 302(c), 56 Stat. 36, 50 U.S.C.A.Appendix, § 942 (c).
[2] January 30, 1942, c. 26, Sec. 1(a), 56 Stat. 23, 50 U.S.C.A.Appendix § 901(a).
[3] Footnote 1, supra.
[4] 7 F.R. 3153.
[5] 7 F.R. 3155.
[6] 7 F.R. 4543.
[7] 7 F.R. 4738.
[8] As provided for in Sec. 203 of the Act. 56 Stat. 31, C. 26, sec. 203, 50 U.S. C.A.Appendix, § 923. Although respondent granted complainant the increase allowed by the California Commission two days after denial of the protest, he has the right under Sec. 204(a) to modify or rescind that order at any time.
[9] 94 U.S. 113, 24 L.Ed. 77.
[10] Nowata County Gas Co. v. Henry Oil Co., 8 Cir., 1920, 269 F. 742, 746.
[11] Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 536, 43 S.Ct. 630, 67 L.Ed. 1103, 27 A.L.R. 1280.
[12] Tyson & Brother United Theatre Ticket Offices v. Banton, 273 U.S. 418, 438, 47 S.Ct. 426, 71 L.Ed. 718, 58 A.L. R. 1236. Cf. Munn v. Illinois, 94 U. S. 113, 126, 24 L.Ed. 77.
[13] New State Ice Co. v. Liebmann, 285 U.S. 262, 273, 52 S.Ct. 371, 76 L.Ed. 747.
[14] Tyson & Brother United Theatre Ticket Offices v. Banton, 273 U.S. 418, 431, 47 S.Ct. 426, 71 L.Ed. 718, 58 A. L.R. 1236; Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 536, 539, 43 S.Ct. 630, 67 L.Ed. 1103, 27 A. L.R. 1280.
[15] New State Ice Co. v. Liebmann, 285 U.S. 262, 302, 52 S.Ct. 371, 76 L.Ed. 747.
[16] 262 U.S. 522, 538, 539, 43 S.Ct. 630, 634, 67 L.Ed. 1103, 27 A.L.R. 1280.
[17] Tyson & Brother United Theatre Ticket Offices v. Banton, 273 U.S. 418, 434, 47 S.Ct. 426, 71 L.Ed. 718, 58 A.L. R. 1236; German Alliance Insurance Co. v. Superintendent of Ins. of State of Kansas, 233 U.S. 389, 34 S.Ct. 612, 58 L. Ed. 1011, L.R.A.1915C, 1189.
[18] Nebbia v. New York, 291 U.S. 502, 531, 534, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Brass v. Stoeser, 153 U.S. 391, 403, 14 S.Ct. 857, 38 L.Ed. 757.
[19] Nebbia v. New York, 291 U.S. 502, 531, 534, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77.
[20] 262 U.S. 522, 535, 43 S.Ct. 630, 632, 67 L.Ed. 1103, 27 A.L.R. 1280.
[21] But see Dissent of Brandeis, J. in New State Ice Co. v. Liebmann, 285 U. S. 262, 283, 52 S.Ct. 371, 76 L.Ed. 747; State v. Barnes, 22 Okl. 191, 97 P. 997.
[22] See G. H. Robinson, The Public Utility Concept in American Law (1928), 41 Harv.L.Rev. 278, and the authorities therein cited.
[23] 233 U.S. 389, 426, 34 S.Ct. 612, 624, 58 L.Ed. 1011, L.R.A.1915C, 1189.
[24] Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469.
[25] German Alliance Insurance Co. v. Superintendent of Ins. of State of Kansas, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011, L.R.A.1915C, 1189.
[26] Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 535, 43 S. Ct. 630, 67 L.Ed. 1103, 27 A.L.R. 1280; Producers Transportation Co. v. Railroad Comm. of California, 251 U.S. 228, 231, 40 S.Ct. 131, 64 L.Ed. 239; Pulitzer Pub. Co. v. Federal Communications Comm., 68 App.D.C. 124, 126, 94 F.2d 249, 251; De Pauw University v. Public Service Comm. of Oregon, D.C., 253 F. 848, 849; Batesville Telephone Co. v. Public Service Comm. of Indiana, D.C., 38 F.2d 511, 514, reversed 7 Cir., 46 F.2d 226; Public Service Comm. of Indiana v. Batesville Telephone Co., 284 U.S. 6, 52 S.Ct. 1, 76 L.Ed. 135; Publix Cleaners v. Florida Dry Cleaning and Laundry Board, D.C., 32 F.Supp. 31, 34; Parsons v. Detroit & Canada Tunnel Co., D.C., 15 F.Supp. 986, 997, affirmed City of Detroit v. Detroit & Canada Tunnel Co., 6 Cir., 92 F.2d 833; Illinois Power & Light Corp. v. City of Centralia, D.C., 11 F. Supp. 874, 893, remanded 7 Cir., 89 F.2d 985; State ex rel. Bricker v. Industrial Gas Co., 58 Ohio App. 101, 16 N.E.2d 218; Ocean Park Pier Amusement Corp. v. City of Santa Monica, 40 Cal.App.2d 76, 104 P.2d 668, 671, 879; Richardson v. Railroad Comm. of California, 191 Cal. 716, 218 P. 418, 420; Highland Dairy Farms Co. v. Helvetia Milk Condensing Co., 308 Ill. 294, 139 N.E. 418, 420; Ford Hydro-Electric Co. v. Town of Aurora, 206 Wis. 489, 240 N.W. 418, 420; Southern Ohio Power Co. v. Public Utilities Comm. of Ohio, 110 Ohio St. 246, 143 N. E. 700, 701, 702, 34 A.L.R. 171. See Restatement of Torts (1934) Sec. 191, Comment a, b; Allen v. Railroad Comm., 179 Cal. 68, 175 P. 466, 474, 8 A.L.R. 249, certiorari denied 249 U.S. 601, 39 S.Ct. 259, 63 L.Ed. 797.
[27] Parsons v. Detroit & Canada Tunnel Co., D.C., 15 F.Supp. 986, 997, affirmed City of Detroit v. Detroit & Canada Tunnel Co., 6 Cir., 92 F.2d 833; Richardson v. Railroad Comm. of California, 191 Cal. 716, 218 P. 418, 420; Southern Ohio Power Co. v. Public Utilities Comm. of Ohio, 110 Ohio St. 246, 143 N.E. 700, 701, 702, 34 A.L.R. 171; Allen v. Railroad Comm., 179 Cal. 68, 175 P. 466, 474, 8 A.L.R. 249, certiorari denied 249 U.S. 601, 39 S.Ct. 259, 63 L.Ed. 797.
[28] Parsons v. Detroit & Canada Tunnel Co., D.C., 15 F.Supp. 986, 997, affirmed City of Detroit v. Detroit & Canada Tunnel Co., 6 Cir., 92 F.2d 833; Illinois Power & Light Corp. v. City of Centralia, D.C., 11 F.Supp. 874, 893, remanded 7 Cir., 89 F.2d 985; State ex rel. Bricker v. Industrial Gas Co., 58 Ohio App. 101, 16 N.E.2d 218; Highland Dairy Farms Co. v. Helvetia Milk Condensing Co., 308 Ill. 294, 139 N.E. 418, 420.
[29] D.C., 15 F.Supp. 986, 987, 997, affirmed City of Detroit v. Detroit & Canada Tunnel Co., 6 Cir., 92 F.2d 833.
[30] 291 U.S. 502, 531, 54 S.Ct. 505, 513, 78 L.Ed. 940, 89 A.L.R. 1469.
[31] Pulitzer Pub. Co. v. Federal Communications Comm., 68 App.D.C. 124, 126, 94 F.2d 249, 251.
[32] 179 Cal. 68, 175 P. 466, 474, 8 A.L.R. 249, certiorari denied 249 U.S. 601, 39 S.Ct. 259, 63 L.Ed. 797.
[33] 241 U.S. 252, 256, 36 S.Ct. 583, 585, 60 L.Ed. 984. Ann.Cas.1916D, 765.
[34] June 18, 1934, c. 590, Sec. 14, 48 Stat. 1001, 19 U.S.C.A. § 81n.
[35] See Brandeis, J., Dissenting in New State Ice Co. v. Liebmann, 285 U.S. 262, 304, 52 S.Ct. 371, 76 L.Ed. 747.
[36] Frost v. Corporation Comm., 278 U. S. 515, 521, 49 S.Ct. 235, 73 L.Ed. 483; City of Joplin v. Southwest Missouri Light Co., 191 U.S. 150, 24 S.Ct. 43, 48 L.Ed. 127; Illinois Power & Light Corp. v. City of Centralia, D.C., 11 F.Supp. 874, 878, remanded 7 Cir., 89 F.2d 985.
[37] City of Joplin v. Southwest Missouri Light Co., 191 U.S. 150, 157, 24 S.Ct. 43, 48 L.Ed. 127.
[38] 278 U.S. 515, 520, 49 S.Ct. 235, 237, 73 L.Ed. 483.
[39] 110 Ohio St. 246, 143 N.E. 700, 701, 34 A.L.R. 171.
[40] 285 U.S. 262, 284, 52 S.Ct. 371, 377, 76 L.Ed. 747.
[41] 291 U.S. 502, 531, 54 S.Ct. 505, 513, 78 L.Ed. 940, 89 A.L.R. 1469.
[42] D.C., 32 F.Supp. 31, 34.
[43] Art. IV, Sec. 33; Art. XII, Sec. 23.
[44] Enacted Stat.1911 (Ex.Sess.) ch. 14, p. 18.
[45] Sec. 2 (aa).
[46] Sec. 2-½, added 1927, ch. 878.
[47] Sec. 19, Sec. 13(a, b, c).
[48] Sec. 50-½.
[49] Sec. 15.
[50] Sec. 32(a).
[51] Sec. 32(b).
[52] Sec. 29.
[53] Sec. 31.
[54] Sec. 44.
[55] Sec. 35.
[56] Sec. 51(a).
[57] Sec. 51(b).
[58] Sec. 52(c).
[59] Sections 75, 76(a, b), 81.
[60] 94 U.S. 113, 24 L.Ed. 77.
[61] Olmstead v. Camp, 33 Conn. 532, 546, 89 Am.Dec. 221.
[62] Producers Transp. Co. v. Railroad Comm. of California, 251 U.S. 228, 231, 40 S.Ct. 131, 64 L.Ed. 239; Terminal Taxicab Co. v. Kutz et al. Public Utilities Comm. of District of Columbia, 241 U. S. 252, 254, 36 S.Ct. 583, 60 L.Ed. 984, Ann.Cas.1916D, 765; also in City of Phnix v. Kasun, 54 Ariz. 470, 97 P.2d 210, 211, 212.
[63] Lamar, J., Dissenting in German Alliance Ins. Co. v. Superintendent of Ins. of State of Kansas, 233 U.S. 389, 426, 34 S.Ct. 612, 624, 58 L.Ed. 1011, L.R.A. 1915C, 1189.
[64] 94 U.S. 113, 131, 132, 24 L.Ed. 77.
[65] 143 U.S. 517, 544, 12 S.Ct. 468, 476, 36 L.Ed. 247.
[66] 7 F.R. 4738, 4739.
[67] Page 444 of excerpts from transcript of hearings before the Committee on Banking and Currency of the House of Representatives, Revised Part 1, held on August 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, and September 17, 18, 22, 23, and 25, 1941.
[68] Pp. 54, 55, id.
[69] Page 445, id.
[70] Page 626, id.
[71] Vol. 87, No. 209, p. 9308, Cong.Record (Nov. 24, 1941).
[72] October 2, 1942, c. 578, Sec. 1, 56 Stat. 765, 50 U.S.C.A.Appendix, § 961 et seq.
[73] H.R. 7565.
[74] Vol. 88, No. 155, pp. 7343-7346, Cong.Record (Sept. 10, 1942).
[75] Vol. 88, No. 168, pp. 7970, 7971, Cong.Record (Oct. 2, 1942).
[76] 56 Stat. 765, 50 U.S.C.A.Appendix, § 961.
[77] Colorado, Stat.Ann. (1935) ch. 137, Sec. 3. See, also, Dunagan v. Town of Red Rock, 58 Okl. 218, 158 P. 1170, 1172.
[78] Lyeth v. Hoey, 305 U.S. 188, 194, 59 S.Ct. 155, 83 L.Ed. 119, 119 A.L.R. 410.
[79] De Pauw University v. Public Service Comm. of Oregon, D.C., 253 F. 848; Allen v. Railroad Comm. of California, 179 Cal. 68, 175 P. 466, 8 A.L.R. 249, certiorari denied 249 U.S. 601, 39 S.Ct. 259, 63 L.Ed. 797; Cawker v. Meyer, 147 Wis. 320, 133 N.W. 157, 37 L.R.A.,N.S., 510; Southern Ohio Power Co. v. Public Utilities Comm. of Ohio, 110 Ohio St. 246, 143 N.E. 700, 34 A.L.R. 171.
[80] New State Ice Co. v. Liebmann, 285 U.S. 262, 284, 302, 52 S.Ct. 371, 76 L.Ed. 747; Producers' Transportation Co. v. Railroad Comm. of California, 251 U.S. 228, 230, 40 S.Ct. 131, 64 L.Ed. 239; Tyson & Brother United Theatre Ticket Offices v. Banton, 273 U.S. 418, 431, 47 S.Ct. 426, 71 L.Ed. 718, 58 A.L.R. 1236; Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 536, 43 S.Ct. 630, 67 L.Ed. 1103, 27 A.L.R. 1280; Associated Pipe Line Co. v. Railroad Comm., 176 Cal. 518, 169 P. 62, 66, L. R.A.1918C, 849; State v. Barnes, 22 Okl. 191, 97 P. 997.
[81] 91 N.H. 229, 17 A.2d 441, 132 A.L. R. 528.
[82] 91 N.H. 229, 17 A.2d 441, 443, 132 A.L.R. 528.
[83] California (The California Statute, as we have seen, does not pretend to be as broad as respondent claims), Indiana, and South Dakota.
[84] Arizona (cotton and wool), Idaho (used in connection with a common carrier), Illinois (grain), Maine (used in connection with a common carrier), Nevada (used in connection with a common carrier), North Dakota (agricultural products), Utah (grain in connection with a common carrier), Washington (used in connection with transportation by water).
[85] California, Idaho, Maine, Nevada, Utah, and Washington.
[86] Indiana, Arizona, South Dakota, Illinois, and North Dakota.
[87] See footnote 82, supra.
[88] See footnote 82, supra.
[89] California, S. Dakota, and Texas.
[90] Arkansas, Georgia, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Minnesota, Missouri, Montana, Nebraska, Nevada, North Carolina, North Dakota, Oklahoma, Oregon, South Carolina, Tennessee, Texas, Utah, Washington, Wisconsin, and Wyoming.
[91] California, Indiana, Minnesota, and North Dakota.
[92] Idaho, Maine, and Utah.
[93] Georgia and Texas.
[94] Arkansas, Illinois, Iowa, Kansas, Missouri, Nebraska, North Carolina, Oklahoma, Oregon, South Dakota, Washington and Wisconsin.
[95] Aug. 15, 1921, c. 64, 42 Stat. 159, 7 U.S.C.A. § 181 et seq.
[96] 42 Stat. 163, 7 U.S.C.A. § 203.
[97] 42 Stat. 164, 7 U.S.C.A. § 205, 42 Stat. 161, 7 U.S.C.A. § 192(b).
[98] 42 Stat. 165 et seq., 7 U.S.C.A. § 208 et seq.
[99] 42 Stat. 159, 7 U.S.C.A. § 183.
[100] 258 U.S. 495, 516, 42 S.Ct. 397, 402, 66 L.Ed. 735, 23 A.L.R. 229.
[101] Swift & Co. v. United States, 316 U.S. 216, 232, 62 S.Ct. 948, 86 L.Ed. 1391; Atchison T. & S. F. R. Co. v. United States, 295 U.S. 193, 201, 55 S. Ct. 748, 79 L.Ed. 1382.
[102] 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483. See, also, Chickasha Cotton Oil Co. v. Cotton County Gin Co., 10 Cir., 40 F. 2d 846, 74 A.L.R. 1070.
[103] Compiled Stat. of Oklahoma (1921), Sec. 3712, 17 O.S. 1941 § 41.
[104] D.C., 15 F.Supp. 986, 997.
[105] New State Ice Co. v. Liebmann, 285 U.S. 262, 284, 285, 302, 52 S.Ct. 371, 76 L.Ed. 747; Producers Transportation Co. v. Railroad Commission of the State of California, 251 U.S. 228, 230, 40 S.Ct. 131, 64 L.Ed. 239.
[106] 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747.
[107] Associated Pipe Line Co. v. Railroad Commission of California, 176 Cal. 518, 169 P. 62, 66, L.R.A.1918C, 849.
[108] Compton's Pictured Encyclopaedia (1942) Vol. 11, p. 364; Moody's Public Utilities Index, April 10, 1943; New International Encyclopaedia (1930) Vol. 19, p. 347.
[109] Nelson's Perpetual Loose Leaf Encyclopaedia, Vol. X, p. 91A; Encylopaedia Americana, Vol. 22, pp. 778-779; National Encyclopaedia (1942) Vol. 8, p. 301.